LOCAL UNION NO. 721 UNITED PACKINGHOUSE FOOD AND ALLIED WORKERS, AFL-CIO, appellee, v. NEEDHAM PACKING COMPANY, INC., d/b/a SIOUX CITY DRESSED BEEF, a corporation, appellant.

No. 52314.

(Reported in 151 N.W.2d 540)

June 6, 1967.

Shull, Marshall, Mayne, Marks & Vizintos, of Sioux City, James A. Gilker, of Fort Smith, Arkansas, and Royall, Koegel & Rogers, of Washington, D. C., for appellant.

Cotton, Watt, Rockler & Jones, of Chicago, Illinois, and Harry H. Smith, of Sioux City, for appellee.

STUART, J.—Needham Packing Company, Inc., has appealed from Orders of the District Court of Woodbury County which denied the company's application to vacate or interpret the award of a board of arbitration and granted the application of Local 721, United Packinghouse Food and Allied Workers of America, AFL-CIO, to enforce the award and appoint a hearing referee.

The controversy between the company and the union arose in May 1961. The company's refusal to arbitrate because of an

illegal strike was sustained by the Iowa courts. 254 Iowa 882, 119 N.W.2d 141. The United States Supreme Court, 376 U. S. 247, 253, 84 S. Ct. 773, 777, 11 L. Ed.2d 680, 685, reversed, saying: "Needham's allegations by way of defense and counterclaim that the union breached the no-strike clause, supported by such facts as were undisputed on the pleadings, did not release Needham from its duty to arbitrate the union's claim that employees had been wrongfully discharged."

An arbitration hearing was held in early December 1964. The arbitrators for Needham and the union maintained the positions of the respective parties so it was agreed Harold W. Davey, the third member of the arbitration board, would write the majority opinion and make the award. He will hereinafter be referred to as the arbitrator.

Two grievances were considered. Grievance 1-A relating to the discharge of Anton Stamoulis was denied and is not involved in this appeal. Grievance 2-A requested the reinstatement of all employees listed thereon (approximately 183) with full seniority rights and full pay for all time lost "because of the fact that they were improperly discharged."

The majority opinion and award of the arbitration board reinstated all employees with full seniority and other contractual rights restored and awarded back pay from November 12, 1961, to the effective date of each grievant's reinstatement reduced by a six-month disciplinary layoff and excluding the period of time "when the case was before the courts" (February 13, 1962 through March 9, 1964).

Needham appealed this award to the Woodbury County District Court which decided: "the grievance before the Arbitration Board was arbitrable", "the board based its award on its interpretation of the collective bargaining agreement of the parties" and that "the board had the authority under the collective bargaining agreement between the parties to render the award made herein." At a subsequent hearing the trial court approved the union's application to enforce the award and postponed the appointment of a hearing referee pending determination of this appeal. Needham appealed from the final order and all interlocutory rulings and decisions adverse to it. We reverse.

■ This action arises under section 301(a) of the Labor Management Relations Act, as amended, 29 U. S. C. A., section 185(a) and is controlled by federal substantive law even though states have been accorded concurrent jurisdiction. Humphrey v. Moore, 375 U. S. 335, 344, 84 S. Ct. 363, 11 L. Ed.2d 370, 378, and citations.

In 1960 the United States Supreme Court decided three cases which defined the respective roles of the arbitrators and the courts in the arbitration of disputes under collective bargaining agreements. In United Steelworkers v. American Manufacturing Co., 363 U. S. 564, 567, 80 S. Ct. 1343, 4 L. Ed.2d 1403, the court said:

■ "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

"The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even friviolous claims may have therapeutic values of which those who are not part of the plant environment may be quite unaware." Page 1407 of 4 L. Ed.2d.

In United Steelworkers v. Warrior & Gulf Navigation Co., 363 U. S. 574, 581, 80 S. Ct. 1347, 1352, 4 L. Ed.2d 1409, 1417, 1418, the court said:

"The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the

parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

"The Congress, however, has by section 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under section 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

In United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U. S. 593, 596, 80 S. Ct. 1358, 1360, 4 L. Ed.2d 1424, 1427, the court said:

"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor dis-

putes by arbitration would be undermined if courts had the final say on the merits of the awards.

"* * * Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

"The opinion of the arbitrator in this case, as it bears upon the award of back pay beyond the date of the agreement's expiration and reinstatement, is ambiguous. It may be read as based solely upon the arbitrator's view of the requirements of enacted legislation, which would mean that he exceeded the scope of the submission. Or it may be read as embodying a construction of the agreement itself, perhaps with the arbitrator looking to 'the law' for help in determining the sense of the agreement. A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement. * * *." Pages 1428, 1429 of 4 L. Ed.2d.

"Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. * * *

"It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." Page 1429 of 4 L. Ed.2d.

With these authorities in mind, we turn to the facts of this particular case. The union was the bargaining representative of employees of Needham Packing Company, a meat-packing plant in Sioux City, under a collective bargaining agreement dated October 1, 1960. The agreement contained the following provisions pertinent to the present controversy.

"8(a). The management of the plant and the direction of the working forces, including the right to hire, suspend, or discharge for just cause, to assign to jobs, to transfer employees temporarily within the plant, to increase and decrease the working force, to determine products to be handled, produced or manufactured, the schedules of production, and the methods, processes and means of production handling, are vested exclusively in the company provided this will not be used for the purpose of discrimination against any employee or to avoid any of the provisions of this agreement.

"9. It is agreed that during the period of this agreement the employees shall not engage in and the union shall not call or sanction any slow down, work stoppage or strike, and no lockout shall be inaugurated by the company."

Section 33, which sets forth the procedure for the adjustment of grievances, contains subsection 33(c)(5) which in part, provides: "In the event a dispute shall arise between the company and the union with reference to the proper interpretation of (sic) application of the provisions of this contract and such dispute cannot be settled by mutual agreement of the parties, such dispute shall be referred to a board of arbitration upon the request of the union."

Because of illness, Loyd L. Needham, president and general manager of the company, was not active from November 18, 1960 to April 14, 1961. Prior to his return, grievances had been handled in a highly informal manner on the spot or in the office. He was concerned about the low production and by the fre-

quency of meetings on grievances during working hours. He sought advice from James A. Gilker, labor relations attorney.

On Tuesday, May 9, 1961, at about 12:30 the employees walked out of the plant, apparently because Needham would not meet during the day to consider grievances. He agreed to meet with the union committee at 4 p.m. At this time, Gilker arrived. Through union officials in Chicago the employees were induced to return to work May 10. On May 11 there was further discussion of grievances. Shortly before the noon break Stamoulis engaged in an argument with the foreman over the assignment of the assistant foreman to work on the line. Stamoulis protested the use of Miller on a production job as a violation of the contract. The foreman said it was an emergency because he was a man short. Stamoulis disputed this and threatened to shut down the line. Upon the advice of Gilker, the foreman told Stamoulis to follow the grievance procedure and that he, would be discharged "if he stopped the chain." On signal by Stamoulis the chain was stopped. He was thereupon discharged.

A brief discussion followed between Gilker, Needham and the union committee during which the company refused the union's demand that Stamoulis be reinstated unless ordered to do so by an arbitrator. Production, which had been resumed during the meeting, was again stopped and the bargaining unit employees left the plant. The foreman and an assistant were instructed to tell each man as he left that he would be subject to disciplinary action if he left his work. Notices were posted indicating there would be work, Friday May 12. No employees reported.

At a union meeting Friday night the employees were opposed to returning to work because of the company's discharge of Stamoulis. The same evening Needham sent the employees the following letter:

"Gentlemen: Because I feel that you may not have had a factual report on the occurrences at the plant the last few days, I felt it would be a good idea to make our position clear.

"We met with Mr. Dave Hart, Mr. John Davidchik and the committee of your local union this afternoon. We told them that a work stoppage for any reason was in direct violation of our

agreement with the union, and asked them whether or not they intended to instruct each of you to return to work immediately. Mr. Hart, speaking for the International Union and Mr. Hines speaking for the local union, told us they would instruct the men to return to work in the morning. We do not know whether or not this was done.

"Any work stoppage is a direct violation of our agreement with the union. Mr. Stamoulis was discharged properly. He was warned that he would be discharged if he stopped the line.

"Any proper grievance can be adjusted under the grievance procedure in the contract. Constant work stoppages make plant operation impossible from the management viewpoint. Such stoppages also cost the employees in lost wages.

"I told Mr. Hart that we wanted the men to report in Saturday, and that if they did not, we would hire other men. I hope you will return to work immediately. ANY NEW MEN HIRED WILL NOT BE DISMISSED TO MAKE ROOM FOR YOU SHOULD YOU DECIDE TO RETURN TO WORK LATER.

"Please give your decision in this matter serious thought. Your decision is very important to you and your families. I hope to have you with us."

On Monday, May 15, the employees did not report for work. Needham advertised and took applications for replacements. Sixty-five new hires reported for work Tuesday, May 16. That morning Dave Hart, the union's district director, contacted Needham. He was told to talk to Gilker in Fort Smith, Arkansas. This telephone conversation and the subsequent events are of great importance. The arbitrator said:

"Testimony concerning the Hart-Gilker May 16 phone conversation is conflicting as to whether they reached an agreement or understanding on how the striking employees would return to work or be returned to work. This matter is dealt with at length later in this opinion. For purposes of the present chronology, it can be stated here that Gilker maintains that there was no understanding or agreement of the kind Hart contends was reached. Hart maintains that he and Gilker agreed that the Stamoulis case would be arbitrated and that all the other men would be returned to work with full seniority and without dis-

crimination, and that the order and manner of their reporting back would be 'worked out'. On this understanding, said Hart, he phoned Davidchik (union field representative) to call a special meeting for that evening and urged him to recommend that the employees return to work on Wednesday morning on the basis agreed upon with Gilker.

"The record shows that Davidchik called Needham around 8 p.m. that night and reported that the union membership had voted to return to work on the basis described by Hart. Needham told Davidchik that he, Needham, would check with Gilker and call him back. Needham testified that he got back to Davidchik about 9 p.m. and told the latter in substance that the men would have to fill out application blanks and come back as new hires."

Mass picketing and violence commenced on the morning of May 17. An injunction was issued on May 26. The only further contact between management and union took place June 26, 1961, which accomplished nothing. Grievances 1-A and 2-A were presented in writing July 5, 1961, which resulted in the court actions hereinabove referred to and, finally, the arbitration award mentioned above.

I. Needham claims the district court erred in ruling that the arbitrator did not base (a) his jurisdiction and (b) his award upon the existence or the negotiation of "agreed upon" terms to end the strike and permit the men to return to work. This error is directed toward the arbitrability of the particular controversy and the authority of the arbitrator to make the award made. Under authorities cited above, arbitration is a matter of contract and parties cannot be compelled to arbitrate a question which they have not agreed to arbitrate. Doubts are to be resolved in favor of coverage. United Steelworkers v. Warrior & Gulf Navigation Co., 363 U. S. 574, 80 S. Ct. 1347, 4 L. Ed.2d 1409, 1417, 1418. "Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U. S. 593, 80 S. Ct. 1358, 1361, 4 L. Ed.2d 1424.

In support of its position Needham cites two Torrington cases. In Torrington Company, Inc. v. Metal Products Workers Union, Local 1645, 347 F.2d 93, 95, the second circuit held it was the duty of the district court to determine whether employer and unions had entered into any agreement to arbitrate grievances with respect to recall of strikers and in doing so must consider whether there was agreement that such dispute should be governed by arbitration provisions of collective bargaining or whether there was an agreement relating only to recall of strikers and not providing for arbitration. The court said:

"Controversies concerning recall to work after a strike are not prima facie, at any rate, grievances 'with respect to the interpretation or application' of any of the provisions of the usual collective bargaining agreement. And the collective bargaining agreement between the parties to the present case contains no provisions which expressly relate to the recall of strikers. Provisions of the collective bargaining agreement are not directly relevant to recall of strikers. In order to apply them to this situation for which they were not designed they must be adapted or selected by analogy. If, therefore, the collective bargaining agreement, including the arbitration clause, is applicable to the recall grievances it must be because there is some special agreement making it applicable or because of some custom or common understanding which has that effect."

In Torrington Co. v. Metal Products Workers (1966), 62 L. R. R. M. 2495, 2498, 362 F.2d 677, 680, the second circuit held: "The question of an arbitrator's authority is subject to judicial review, and the arbitrator's decision that he has authority should not be accepted where the reviewing court can clearly perceive that he has derived that authority from sources outside the collective bargaining agreement at issue. See Textile Workers Union v. American Thread Co., 291 F.2d 894, 52 L. R. R. M. 2543 (4 Cir. 1961)."

The union does not take issue with the quoted authorities but insists they are not applicable here because the company has a wholly mistaken view of the arbitrator's decision. The union says: "What the arbitrator is concerned with, quite obviously, is not a separate and distinct agreement, but rather the circum-

stances which led the union to vote to return to work and to have the Stamoulis matter handled through arbitration. He is also considering the significance of the company's abrupt announcement that the men would have to come back as new hires and without seniority—just at the point when the union, acting upon what Mr. Hart understood to be the basis for the men's return as discussed by him with Mr. Gilker, arranged to have the men vote to go back to work. To attempt to separate out these company-union discussions, and the events which took place in connection with them, and to treat them as wholly unrelated to the collective bargaining agreement—as the company does—is to distort and twist the arbitrator's decision in a completely unjustifiable manner."

 As we are not permitted to reexamine the merits of the arbitration decision, we will review the question of arbitrability on the basis of the findings and conclusions of the arbitrator. Insofar as possible, we will use quotations from his decision. Page references are to the page of his opinion from which the quote has been taken. As the same findings and conclusions are repeatedly expressed, we have used the language which, in our opinion, is most appropriate for our purposes here. They deal primarily with the conclusions reached by the arbitrator which changed an illegal strike into an illegal lockout.

"The officers of Local 721 and the bargaining unit employees who walked out on May 11, 1961, did unquestionably violate Paragraph 9 by their walkout. Their purpose indisputably was to attempt to effectuate Stamoulis' reinstatement by such an illegal walkout instead of by utilizing the grievance and arbitration mechanism of paragraph 33 of the contract. Such illegal and improper conduct continued until Tuesday, May 16, 1961, notwithstanding an effort to end the walkout by (union officials)." (Page 80)

"The strikers knew two things for certain between May 11 and May 16 in terms of what the company had already made clear: 1) they were subjecting themselves to disciplinary action by striking in violation of the contract, and 2) if the company began to hire while they were still out, the new hires would not

themselves be replaced as far as the company was concerned." (Page 87)

"Needham was on firm solid ground from a legal standpoint when he began to exercise his right to hire on Monday, May 15, 1961—*and the union knew this.* It was Needham's initiation of hiring that caused Davidchik to call Hart; Hart to call Needham; and then Hart to call Gilker." (Page 89)

"Whatever the discrepancies may be in the testimony of Hart and Gilker as to what transpired in their phone conversation of May 16, 1961, their testimony is in accord in the following significant respects:

"1) Both Gilker and Hart are in accord that the sole purpose of their phone conversation on May 16 was to work out a basis for the return of the men to work and a resumption of normal contractual relationships.

"2) Gilker made clear to Hart, which Hart's testimony acknowledges, that those hired by Needham on Monday and Tuesday who proved to be satisfactory would not be replaced to make room for returning strikers.

"3) Hart made clear to Gilker, which Gilker's testimony acknowledges, that the return to work should take place with no discrimination and with no more heads rolling.

"4) Hart's testimony showing he understood Gilker's point about the 'problem' of the new men hired on Monday and Tuesday is confirmed by the testimony of Helstein and also by the late Mr. Davidchik at the unemployment compensation hearing.

"5) Gilker's testimony and Hart's testimony are in agreement on the point that Gilker at no time in their conversation stated that the men returning to work would come back in the status of new hires with zero seniority." (Pages 89, 90)

"On the night of May 16, pursuant to Hart's instructions to Davidchik, the membership met and voted to return to work the next day in terms of what Davidchik understood from Hart was a verbal agreement reached that same morning on the phone between him and Gilker." (Page 80)

When informed of the vote, "the company, through Needham himself to Davidchik on the night of May 16, announced total deprivation of seniority as a condition for accepting re-

turning strikers and further announced that some unspecified strikers would not be accepted back under any circumstances." (Page 90)

"Hart was completely justified in regarding Needham's terms to Davidchik as a breach or repudiation of his understanding with Gilker. *This conclusion is reached in terms of what Gilker himself testified he said (and did not say) to Hart that morning.*" (Page 91)

"*Before this, the employees were clearly in the wrong and properly subject to severe discipline.*

"*After this, the company was in the wrong* because the terms stated to Davidchik were a violation of the contract on the company's part (i.e., total deprivation of seniority used as disciplinary weapon) ; were drastically different from *Gilker's own version* of what he told Hart that same morning; and, finally, were psychologically calculated to assure their rejection." Page 93.

"The Needham terms must realistically be regarded as approximating the discharge of the entire bargaining unit through the improper means of a total deprivation of seniority for participation in a wildcat strike." (Page 86)

Although the arbitrator made no finding as to specific terms, these conclusions clearly indicate he found an agreement was reached in the telephone conversation regarding the men's return to work which differed from the terms repeated by Needham to Davidchik. On page 42 of his decision he said: "Of paramount significance in the instant proceeding is the question whether there was a telephonic understanding or agreement reached between Gilker and Hart in their telephone conversation, Tuesday morning May 16, 1961, and if so what was its nature."

This is in line with the position of the union which claimed the men were wrongfully discharged. He said: "The union does not dispute the fact that the work stoppage which began May 11, 1961, was a wildcat in violation of paragraph 9. However, the union stresses the thesis that the nature of the situation changed fundamentally the night of May 16, 1961, when Needham told Davidchik that everybody taken back would have to

return with zero seniority as new hires. Needham's ultimatum, says the union, was tantamount to an illegal lockout. Its *terms were a basic departure from and a repudiation of the understanding* reached between Hart and Gilker the same morning." (Page 79) (Emphasis supplied).

The terms upon which the men were to return to work as understood by the union officials are of decisive significance in his decision on arbitrability and the award made. He said:

"The company's terms for return, as announced by Needham to Davidchik, can be related to the question of the arbitrability of Grievance No. 2-A. Between the time the men walked out illegally on May 11, 1961, and the time they voted to return and arbitrate the Stamoulis case, the company may fairly be said to have had a grievance against the men and the union of a most serious nature. The damage suit now pending in court *is one reflection of this which is not our proper concern here.* However, from the time Needham's terms for return as new hires were made known, the employees had a clear grievance against the company. The only basis on which they could have returned was by a complete capitulation to Needham's terms. As already noted, these terms were themselves a violation of contract because of the blunt and manifestly improper use of total seniority rights deprivation rather than disciplinary action as such.

"The employees, through Davidchik, had indicated clearly to Needham on May 16, 1961, that they were ready to abandon previously asserted positions and to abide by the contract. After hearing this from Davidchik, Needham nevertheless *changed the terms* for return suddenly and drastically from those his authorized spokesman, Gilker, had indicated to Hart that morning. In the Arbitration Board Chairman's mind, this Needham-to-Davidchik ultimatum is of decisive significance in requiring a holding that Grievance No. 2-A is arbitrable."

The grievance filed by the union was based upon the improper discharge of the employees. At no time did the arbitrator say that discharge was an excessive penalty for the illegal walkout. He said: "It is true the management, if it chooses to do so, has a legal right to replace economic strikers engaged in a lawful strike and also to replace wildcat strikers. It is also true

that wildcat strikers expose themselves to severe disciplinary action up to and including discharge. It may also be conceded, from a moral or ethical standpoint, that those engaged in a contract violating wildcat ought not to enjoy a more favorable fate than those engaged in a legal strike." (Page 86)

He also recognized that: "When reviewing a penalty in a discipline case, an arbitration board should not substitute its judgment for that of management as to the proper penalty. When cause for discipline has been proved, the penalty assessed should not be reduced unless the record establishes that the penalty was clearly excessive in relation to the offense or was clearly arbitrary, capricious or discriminatory." (Page 78)

There is no indication in the opinion that he felt the penalty of discharge was "clearly excessive, arbitrary, capricious or discriminatory." Instead, he drew "a crucial distinction" between "the exercise of a legal right to replace strikers and keep their replacements and telling such striking employees after they voted to return that they will be accepted back only as new hires with zero seniority." Thus he was able to conclude the company violated provision 8(a) of the collective bargaining agreement through the "improper use of total seniority rights deprivation rather than disciplinary action as such."

Three matters are essential to support his determination that Grievance 2-A is arbitrable:

1. The telephone conversation which justified the union officials in believing there had been an agreement on the conditions under which the employees could return to work.

2. The vote by the union members to return to work on the conditions as they understood them to be.

3. Needham's statement, after having been informed of the vote, that the striking employees must return as new hires with zero seniority.

The arbitrator could not have found the dispute arbitrable without all three circumstances. Needham could not have been held to have violated the contract, if he had specifically expressed the new hire-zero seniority requirement before the vote. The arbitrator had already determined the company had a legal right to discharge the striking employees. Under provision

924

19(c)(1) of the collective bargaining agreement, an employee discharged for just cause lost all seniority rights when reemployed. The fact the vote preceded the announcement is crucial.

Had the union members voted on their own to return to work on the same conditions as outlined in the telephone conversation, the company would have had no legal obligation to accept such conditions. At no time have the union members made an unconditional offer to return to work and to settle their grievances by arbitration. Therefore, the conclusion that the union purged itself of misconduct by voting to return to work, depends on the existence of "agreed upon terms" which were later breached by the company. The arbitrator makes no specific finding as to the terms of such agreement but finds that whatever they were, they were breached or repudiated by Needham's statement which contained conditions not discussed in the telephone conversation. He frequently makes reference to the "agreed upon terms" and their "repudiation" by Mr. Needham's actions.

If the arbitrator had not found that an agreement had been reached, which the company repudiated, the company would have been within its legal rights in doing exactly what it did do. We must therefore conclude the arbitrator derived his jurisdiction and authority from this agreement rather than drawing its "essence" from the collective bargaining agreement. It contains no provision for arbitrating a dispute over the return to work after an illegal strike. As pointed out in Torrington such provision is not relevant to a collective bargaining agreement. The principal reason an employer agrees to arbitration is to obtain a no-strike provision in the collective bargaining contract. "The parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement." United Steelworkers v. Warrior & Gulf Navigation Co., supra, loc. cit. 4 L. Ed.2d 1417. It cannot be implied that the arbitration clause was intended to include an agreement to arbitrate the return to work after an illegal strike when a strike was prohibited under the terms of the agreement. An illegal strike makes it impossible to obtain the goal of uninterrupted production by arbitration.

The grievance was for the wrongful discharge of the employees based on the violation of the "agreed upon terms" for the employees' return to work, not upon the illegal use of total deprivation of seniority. This concept originated with the arbitrator. It may be that proof the company violated such an agreement would subject the company to damages. This is not for us to decide. However it is far different from saying the company agreed in the collective bargaining agreement to submit this particular type of dispute to arbitration. It may also be that this is the kind of ambiguous decision which the United States Supreme Court has enjoined the courts not to question, but we believe the difficulty is more basic. The finding of arbitrability, in our opinion, is inconsistent with many of the other findings and conclusions of the arbitrator. The "arbitrator's words manifest an infidelity" to his obligation to draw the "essence" of the authority and award from the collective bargaining agreement. United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, loc. cit. 4 L. Ed.2d 1428. We do not believe this controversy can be held arbitrable under these findings and conclusions.

Therefore, as his conclusions demonstrate "he derived his authority from sources outside the collective bargaining agreement at issue", we must vacate the arbitrator's award as being beyond his jurisdiction and the extent of his authority. In view of this determination we need not decide the other errors urged by the company.

The union's Motion to Dismiss Appeal as being untimely filed which was submitted with the case is hereby denied.

The case is reversed.—Reversed.

GARFIELD, C. J., and LARSON, SNELL and MOORE, JJ., concur.

BECKER and MASON, JJ., dissent.

RAWLINGS, J., takes no part.

BECKER, J.—I dissent. It would appear that the complexity and difficulty of the industrial relations evidenced by this case is an example of the reasons for the rules laid down, and cited by the majority, in United Steelworkers v. American Manu-

facturing Co., United Steelworkers v. Warrior & Gulf Navigation Co. and United Steelworkers v. Enterprise Wheel & Car Corp. (citations in majority opinion). After citing the admonitions in those cases, the majority seems to indulge in the close scrutiny of the arbitrator's reasoning that is expressly warned against by the United States Supreme Court in above noted cases.

It seems to me that the point now decided by this court was brought before us on motion for separate adjudication of law points. We sustained defendant's position in Local Union No. 721 v. Needham Packing Co., 254 Iowa 882, 119 N.W.2d 141. The matter was appealed to the Supreme Court of the United States and this court was reversed. Local Union No. 721, etc. v. Needham Packing Co., 376 U. S. 247, 84 S. Ct. 773, 11 L. Ed.2d 680. I can not see that the facts or issues *now decided* are essentially different after trial from the alleged facts considered by the courts on that prior motion.

As stated by the arbitrator in his opinion, while the Supreme Court did not decide that the grievances here considered were arbitrable, it did decide that the company was not released from its duty to arbitrate on the basis that the union had violated the no-strike clause. The arbitrator then found specifically on a fully developed record: "However, the record does *not* support a finding that the Union or the employees had so totally breached the contract as to warrant the Company in regarding them as having terminated their relationship with the Company." Thus we are again deciding the same point as a matter of law that was adversely decided by the Supreme Court as a *matter of law* and adversely decided by the arbitrator as a matter of law and fact.

"Needham's allegations by way of defense and counterclaim that the union breached the no-strike clause, supported by such facts as were undisputed on the pleadings, did not release Needham from its duty to arbitrate the union's claim that employees had been wrongfully discharged. On that basis, we reverse and remand to the Iowa Supreme Court for further proceedings. It is so ordered." 84 S. Ct., at 777.

9 Williston on Contracts, Third Ed., Jaeger, section 1023B, page 488 et seq., contains a careful analysis of this entire matter; quotation of a portion of that work seems apropos:

"3. While failure or refusal to carry out a material term going to the essence of a contract justifies the other party's rescission, *it does not have this effect where there is a breach of a 'no-strike" clause in a collective bargaining agreement * * ** (emphasis supplied).

"* * *

"As judicially construed, this clause requires that all disputes or grievances, unless expressly excluded, shall be referred or submitted to an arbiter or arbitral tribunal. In brief, whenever there is room for doubt, arbitration must be ordered. *It is hardly possible to repeat this judicially announced 'canon' of construction often enough, or to emphasize it sufficiently,* although the attempt will be made by an examination and analysis of the case-law in the pages which follow (emphasis by author).

"* * *

"In summary, then, the function of the judicial forum is strictly limited where the arbitration clause in a collective bargaining agreement is under scrutiny. Essentially, it is confined to determining whether a party seeking arbitration is making a claim which *prima facie* is governed by the terms of the contract. Where this is true, the Supreme Court has issued a mandate imposing restraint upon the courts, i.e., a self-denying attitude and affirmatively, prompt reference to arbitration unless there is a clear and explicit provision excluding the question or dispute from arbitration."

Williston's analysis is a careful examination of the federal law in this field. It sustains what the arbitrator and the trial court did here.

To me it would appear that every argument now used by the majority was either implicitly or explicitly considered by the United States Supreme Court and rejected. On the same facts we now reaffirm our opposite position. I think we should follow the clear mandate of the court of last resort on this matter.

MASON, J., joins in this dissent.