The TORRINGTON COMPANY,
Plaintiff-Appellee,

v.

METAL PRODUCTS WORKERS UNION
LOCAL 1645, UAW, AFL-CIO and In-
ternational Union UAW, AFL-CIO, De-
fendants-Appellants.

No. 291, Docket 30154.

United States Court of Appeals
Second Circuit.

Argued March 3, 1966.

Decided June 22, 1966.

Feinberg, Circuit Judge, dissented.

Jay S. Siegel, Hartford, Conn. (William J. Larkin, 2d, Waterbury, Conn., C. E. Harwood, Torrington, Conn., on the brief), for plaintiff-appellee.

Jerome S. Rubenstein, New York City (Rubenstein & Rubenstein, New York City, on the brief), for defendants-appellants.

Before LUMBARD, Chief Judge, and KAUFMAN and FEINBERG,* Circuit Judges.

LUMBARD, Chief Judge:

This appeal presents the question whether an arbitrator exceeded his authority under the collective bargaining agreement between The Torrington Company (Torrington) and Metal Prod-

* Argument heard as District Judge, sitting by designation.

ucts Workers Union Local 1645, UAW, AFL-CIO (the Union), in ruling that the agreement contained an implied provision, based upon prior practice between the parties, that Torrington would allow its employees up to one hour off with pay to vote each election day. The District Court for the District of Connecticut held that "the arbitrator exceeded and abused his authority when he attempted to read into the agreement this implied contractual relationship," and it vacated and set aside the arbitrator's award. We affirm.

In its company newsletter of December 1962, Torrington announced that it was discontinuing its twenty-year policy of permitting employees time off with pay to vote on election days.[1] This policy had been unilaterally instituted by the company and was not a part of the then-existing collective bargaining agreement, which contained an extremely narrow arbitration provision. The Union did not attempt to arbitrate this issue. Rather, on April 9, 1963, it filed a many-faceted complaint with the National Labor Relations Board which included a charge that the unilateral change of election day policy constituted an unfair labor practice.

The Union later dropped this charge, and the Board dismissed the entire complaint on July 29, 1963. In August, the parties began negotiations for a new collective bargaining agreement, as the old contract was due to expire September 27, 1963. At the first meeting, Torrington informed the Union that it did not intend to reestablish its paid time off for voting policy. The Union responded by including a contrary provision in its written demands presented at a meeting in August or early September.

At this point, the record is somewhat unclear as to the circumstances surrounding the negotiations. We know that in the written proposals made by Torrington (September 26) and by the Union (October 25), *each* suggested that the old contract be continued with specific amendments, none of which involved the election day policy. We know that a long and costly strike began when the old contract expired on September 27, that some employees worked during the strike, and that those employees were not given paid time off for the November 1963 elections. And it is conceded by all that the current contract, signed on January 18, 1964, contained, like the old, no mention of paid time off for voting.

When the 1964 elections became imminent, Torrington's understanding of its rights under the new contract was revealed by a union flier to the employees dated November 2, 1964. The Union reported that, "The Torrington Company has again stated that you will *not* be allowed the one hour time off for voting this year." This time, however, the Union was armed with a new weapon, for the new contract contained a much less restrictive arbitration clause.[2] Thus,

1. Torrington's brief on appeal explains that this decision was made because "in the light of the extension of voting hours and the substitution of voting machines for paper ballots * * * it was no longer necessary to permit employees time off to vote."

2. Relevant portions of Article V of the agreement are as follows:
   "*Section 1.*—If a grievance is not settled after it has been processed through the three (3) steps described in Article IV above, and if it is a grievance with respect to the interpretation or application of any provisions in this contract and is not controlled by Section 1 of Article XIV, (Management) it may be submitted to arbitration in the manner herein provided * * *

"*Section 3.*—The arbitrator shall be bound by and must comply with all of the terms of this agreement and he shall have no power to add to, delete from, or modify, in any way, any of the provisions of this agreement. The arbitrator shall not have the authority to determine the right of employees to merit increases. The arbitrator shall have no authority to set or determine wages except as provided by Section 21 of Article VI, Wages.
"*Section 4.*—The decision of the arbitrator shall be binding on both parties during the life of this agreement unless the same is contrary, in any way, to law."
Compare note 7 infra.

on December 17, 1964, the Union filed the grievance which underlies this case. When no solution was reached by the parties, application was made to the American Arbitration Association for determination under its Voluntary Labor Arbitration Rules, and the arbitrator was selected by the parties. A hearing was held on May 19, 1965.

In his written decision, the arbitrator first held that the dispute was arbitrable under the new contract's arbitration clause even though the contract contained no express provision for paid time off for voting, a decision which is not challenged. See, e. g., United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Procter & Gamble Independent Union of Port Ivory v. Procter & Gamble Mfg. Co., 298 F.2d 644 (2 Cir. 1962). Compare Metal Prods. Workers Union, etc. v. Torrington Co., 358 F.2d 103 (2 Cir. 1966). He then ruled that the benefit of paid time off to vote was a firmly established practice at Torrington, that the company therefore had the burden of changing this policy by negotiating with the Union, and that in the negotiations which culminated in the current bargaining agreement the parties did not agree to terminate this practice. Finding further that this employee benefit was not within management's prerogative under the "management functions" clause of the contract,[3] the arbitrator held that employees who took time off to vote on November 3, 1964, or who worked on that day and had received an election benefit in 1962 must be paid a comparable benefit for Election Day 1964.

The company petitioned to vacate the award. Judge Clarie agreed with the arbitrator that the practice at issue had been long established at Torrington prior to 1963. But he also found that, "Throughout the negotiations [of 1963–1964], the plaintiff employer persistently reiterated its position not to grant this benefit [in the new contract]." Commenting that, "Labor contracts generally affirmatively state the terms which the contracting parties agree to; not what practices they agree to discontinue," Judge Clarie held that the arbitrator had gone outside the terms of the contract and thus had exceeded his authority by reading the election day benefit into the new contract after the parties had negotiated the issue but had made no such provision in that contract.

The essence of the Union's argument on appeal is that, in deciding that the arbitrator exceeded his authority in making this award, the District Court exceeded the scope of its authority and improperly examined the merits of the arbitrator's award. The Union relies on the language in United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960), the third of the famous Steelworkers trilogy in which the Supreme Court outlined the proper role of the judiciary in labor arbitration cases, to the effect that the courts are not "to review the merits of an arbitration award."

I.

It is now well settled that a grievance is arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. at 582–583, 80 S.Ct. at 1353.[4] A less settled question is the appropriate

---

3. Section 1 of Article XIV gives management exclusive right to determine the places and products of manufacture, the methods and processes to be used, and whether work shall be sub-contracted out. Section 2 leaves with the company "all other rights of management." Torrington does not contend that Article XIV is applicable to this dispute.

4. It has been argued that this standard should be broadened to render not arbitrable any situation where "a frivolous claim [is made] that a grievance is within the scope of the agreement." Freidin, Discussion of a paper by Sam Kagel, in Arbitration and Public Policy 10, 14 (Proceedings of the Fourteenth Annual Meeting, National Academy of Arbitrators 1961).

scope of judicial review of a specific arbitration award. Although the arbitrator's decision on the merits is final as to questions of law and fact, his authority is contractual in nature and is limited to the powers conferred in the collective bargaining agreement.[5] For this reason, a number of courts have interpreted *Enterprise Wheel* as authorizing review of whether an arbitrator's award exceeded the limits of his contractual authority. See H. K. Porter Co. v. United Saw, File & Steel Prods. Workers, 333 F.2d 596 (3 Cir. 1964); Truck Drivers & Helpers Union Local 784 v. Ulry-Talbert Co., 330 F.2d 562 (8 Cir. 1964); I. A. M. v. Hayes Corp., 296 F.2d 238, 242–243 (5 Cir. 1961). The precise question seems not to have arisen in this Circuit, compare Local 453, Intern. Union of Electrical, etc. v. Otis Elevator Co., 314 F.2d 25 (2 Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963), where the arbitrator's power to settle the dispute was clear, but we have plainly intimated that the arbitrator's authority to render a given award is subject to meaningful review. See Carey v. General Elec. Co., 315 F.2d 499, 508 (2 Cir. 1963). We agree with *Carey* that this is an appropriate question for judicial review.

■■ Torrington contends that the arbitrator exceeded his authority in this case by "adding" the election day bonus to the terms of the January 1964 agreement. However, the arbitrator held that such a provision was implied by the prior practice of the parties. In some cases, it may be appropriate exercise of an arbitrator's authority to resolve ambiguities in the scope of a collective bargaining agreement on the basis of prior practice, since no agreement can reduce all aspects of the labor-management relationship to writing. However, while courts should be wary of rejecting the arbitrator's interpretation of the implications of the parties' prior practice, the mandate that the arbitrator stay within the confines of the collective bargaining agreement, footnote 5 supra, requires a reviewing court to pass upon whether the agreement authorizes the arbitrator to expand its express terms on the basis of the parties' prior practice. Therefore, we hold that the question of an arbitrator's authority is subject to judicial review, and that the arbitrator's decision that he has authority should not be accepted where the reviewing court can clearly perceive that he has derived that authority from sources outside the collective bargaining agreement at issue. See Textile Workers Union of America v. American Thread Co., 291 F.2d 894 (4 Cir. 1961).[6]

---

However, while plausible, such a position was not adopted by the Supreme Court, primarily because there is real advantage in sending even frivolous claims to arbitration. Moreover, as a long-time labor arbitrator and member of this court has said, "No great harm is done by applying a liberal rule as to arbitrability, if the court carefully scrutinizes what the arbitrator later decides." Paul R. Hays, Labor Arbitration, A Dissenting View 80 (1966).

5. "[The arbitrator] does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. at 597, 80 S.Ct. at 1361.

6. Of course, it can be argued that our decision authorizes an impermissible review of the "merits" in a case where the principal issue was whether the arbitrator should find an implied substantive obligation in the contract, see Meltzer, The Supreme Court, Arbitrability, and Collective Bargaining, 28 U.Chi.L.Rev. 464, 484–85 (1961), but we think this position is contrary to *Enterprise Wheel*. See note 5 supra. The question of the arbitrator's authority is really one of his contractual jurisdiction, and the courts cannot be expected to place their stamp of approval upon his action without making some examination of his jurisdiction to act. As stated above, we think more exhaustive judicial review of this question is appropriate after the award has been made than before the award in a suit to compel arbitration; in this way, the court receives the benefit of the arbitrator's interpretive skills as to the matter of his con-

## II.

Unfortunately, as the dissenting opinion illustrates, agreeing upon these general principles does not make this case any easier. Certain it is that Torrington's policy of paid time off to vote was well established by 1962. On this basis, the arbitrator ruled that the policy must continue during the 1964 agreement because Torrington did not negotiate a contrary policy into that agreement. To bolster his decision, the arbitrator noted that Torrington's written demands of September 26, 1963, constituted the first occasion on which either party did not expressly insist that its election day position be adopted. Therefore, he concluded, it was the company which removed this question "from the table" and the company cannot complain if its policy under the old contract is now continued.

We cannot accept this interpretation of the negotiations. In the first place, as Judge Clarie stated, labor contracts generally state affirmatively what conditions the parties agree to, more specifically, what restraints the parties will place on management's freedom of action. While it may be appropriate to resolve a question never raised during negotiations on the basis of prior practice in the plant or industry, it is quite another thing to assume that the contract confers a specific benefit when that benefit was discussed during negotiations but omitted from the contract.

"[I]n entering into a collective agreement, in the negotiations for which as much care and deliberateness were exercised in respect to the omission as to the inclusion of various restraints and obligations, neither party agreed to submit to an arbitrator the question of whether it should be subjected to the very restraint or obligation which in negotiations the parties, by omitting it from the contract, agreed the contract should *not* subject it to." Freidin, supra note 4, at p. 12.

The arbitrator's primary justification for reading the election day benefit into the 1964 agreement was that such a benefit corresponded to the parties' prior practice. But in this the arbitrator completely ignored the fact that the company had revoked that policy almost ten months earlier, by newsletter to the employees in December 1962 and by formal notice to the Union in April 1963. It was within the employer's discretion to make such a change since the narrow arbitration clause in the previous collective bargaining agreement precluded resort to arbitration by the Union.[7] And there was no showing that Torrington's announcement was merely a statement of bargaining position and was not a seriously intended change in policy.

In light of this uncontroverted fact, and bearing in mind that the arbitrator has no jurisdiction to "add to" the 1964

tractual authority. See Livingston v. John Wiley & Sons, Inc., 313 F.2d 52, 59 n. 5 (2 Cir. 1963), aff'd, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

7. Article V, § 3 of the prior contract provided:

"The arbitrator is bound by and must comply with all the terms of this agreement, and he shall not have any power whatsoever to arbitrate away any part of the agreement, nor add to, delete from, or modify, in any way, any of the provisions of this agreement. The Company's decisions will stand and will not be overruled by any arbitrator unless the arbitrator can find that the Company misinterpreted or violated the express terms of the agreement."

The Union concedes that the scope of arbitration under this contract was

"strictly limited," but it contends that the modification of the above provision in the 1964 agreement, see footnote 2 supra, "necessarily impels" the conclusion that the parties intended to confer upon the arbitrator the authority exercised in this case. It is true that under the 1964 agreement the arbitrator is no longer bound by the Company's decision in all cases where the Company has not "misinterpreted or violated the express terms of the agreement." However, the new agreement retained the prohibition against an arbitrator "adding to" its provisions, and we do not think that the parties intended to confer upon the arbitrator unreviewable power to determine the scope of his authority with respect to a particular grievance.

682

agreement, we do not think it was proper to place the "burden" of securing an express contract provision in the 1964 contract on the company. At the start of negotiations, Torrington announced its intent to *continue* its previous change of election day policy. This was an express invitation to the Union to bargain with respect to this matter. After the Union failed to press for and receive a change in the 1964 agreement, the company was surely justified in applying in November 1964 a policy it had rightfully established in 1962, and had applied in November 1963 (during the strike).

■ In our opinion, the Union by pressing this grievance has attempted to have "added" to the 1964 agreement a benefit which it did not think sufficiently vital to insist upon during negotiations for the contract which ended a long and costly strike. We find this sufficiently clear from the facts as found by the arbitrator to agree with the district court that the arbitrator exceeded his authority by ruling that such a benefit was implied in the terms of that agreement. As Judge Brown has written for the Fifth Circuit:

"But if full rein is to be given to this device as a means thought best able to achieve industrial peace, it must be enforced with an even hand. That which the parties have committed to the arbiter is for the arbiter alone, not the Court. Courts must assure that. But it is equally important to assure that neither party—through one guise or another—may obtain the intervention of an arbiter when the contract clearly excludes it from the reach of the grievance machinery." Local Union No. 787, I. U. E. v. Collins Radio Co., 317 F.2d 214, 220 (1963).

Far from having the disruptive effect upon the finality of labor arbitration which results when courts review the "merits" of a particular remedy devised by an arbitrator, we think that the limited review exercised here will stimulate voluntary resort to labor arbitration and thereby strengthen this important aspect

of labor-management relations by guaranteeing to the parties to a collective bargaining agreement that they will find in the arbitrator not a "philosopher king" but one who will resolve their disputes within the framework of the agreement which they negotiated.

The judgment is affirmed.

FEINBERG, Circuit Judge (dissenting):

I respectfully dissent.

I start with the proposition, accepted by the majority, that an arbitrator's award may be reviewed by the courts only to see if "it draws its essence from the collective bargaining agreement" and whether "the arbitrator's words manifest an infidelity to this obligation." See United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). But this inquiry is a very limited one and, so limited, should lead to reversal of the court below.

The arbitrator in this case concluded that both parties agreed at the bargaining table to continue the prior practice of paid time off for voting. It is clear that the new contract did not by its terms deal with the time off for voting issue. But the arbitrator reasoned that it was the company, not the union, that was trying to change the twenty-year old practice. It was the company that introduced the issue into the bargaining at the first negotiation meeting in August 1963, and insisted on a change in the practice. Thereafter, according to the arbitrator, the company "removed * * * [this demand] from the table * * *. Thus * * * both parties agreed that the old contract was to be continued except for certain changes among which was *not* a change in the practice of giving time off with pay for voting."

The arbitrator assumed that a collective bargaining agreement can include terms or conditions not made explicit in the written contract. This proposition is correct. In a prior appeal involving these same parties and this same con-

tract, this court said that the arbitration clause of the agreement could be applicable to a recall grievance if there were "some special agreement making it applicable or * * * some custom or common understanding which has that effect." Torrington Co. v. Metal Prods. Workers, 347 F.2d 93, 95 (2d Cir.), cert. denied, 382 U.S. 940, 86 S.Ct. 394, 15 L.Ed.2d 351 (1965). This is a clear statement of the view that it is proper to look beyond the terms of a labor contract in interpreting it. In United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), the Supreme Court said: "Gaps [in the "written document"] may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." [1] Moreover, the difference between the earlier (1961–1963) and the new contract in this case is most significant. The arbitration article in the earlier contract contained the following limitations on the arbitrator's power:

> The Company's decisions will stand and will not be over-ruled by any arbitrator unless the arbitrator can find that the Company misinterpreted or violated the express terms of the agreement.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> No point not covered by this contract shall be subject to arbitration &ast; &ast; &ast;.

After a 16-week strike in which the scope of the arbitration clause was an important issue (which, in itself, is unusual), these limitations on the arbitra-

tor's power were excluded in the new contract. This was a clear recognition by the parties that there can be "implied" as well as "express" terms in the agreement. In this case, the arbitrator held that pay for time off for voting was a benefit which was such "an implied part of the contract." If so, then, of course, the arbitrator did not "add to, delete from, or modify, in any way, any of the provisions of this agreement" in violation of the arbitration clause.

Thus, the arbitrator looked to prior practice, the conduct of the negotiation for the new contract and the agreement reached at the bargaining table to reach his conclusion that paid time off for voting was "an implied part of the contract." From all of this, I conclude that the arbitrator's award "draws its essence from the collective bargaining agreement" and his words do not "manifest an infidelity to this obligation." Once that test is met, the inquiry ends. Whether the arbitrator's conclusion was correct is irrelevant[2] because the parties agreed to abide by it, right or wrong.[3] Nevertheless, the majority has carried the inquiry further and concerned itself with a minute examination of the merits of the award, which we are enjoined not to do.[4] Thus, the majority opinion states that the arbitrator "ignored the fact that the company had revoked [its] * * * policy almost ten months earlier." Of course, the arbitrator was aware of the company's actions in December 1962 and April 1963 and referred to them in his opinion. And I would suppose that what significance to attach to these acts—e. g., whether the company

---

1. See also Willson H. Lee Co. v. New Haven Printing Pressmen, 248 F.Supp. 289, 290 (D.Conn.1965) (arbitrator may seek guidance from past practices of the company); American Mach. & Foundry Co. v. UAW, 48 CCH Lab.Cas. ¶ 18452, at 29746 (S.D.N.Y.1963), aff'd per curiam, 329 F.2d 147 (2d Cir. 1964) (same); United Furniture Workers v. Virco Mfg. Corp., 45 CCH Lab.Cas. ¶ 17771, at 27325 (E.D.Ark.1962) (same); Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1498–1500 (1959).

2. I by no means imply that I think the arbitrator was wrong here on the merits.

3. The reluctance of these parties to accept an arbitrator's award is, of course, not confined to one side. In Metal Prods. Workers Union, etc. v. Torrington Co., 358 F.2d 103 (2d Cir. 1966), the union similarly moved to vacate an arbitrator's award.

4. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. at 598–599, 80 S.Ct. at 1361–1362.

could "revoke" its policy unilaterally— and to the bargaining held thereafter is exactly the sort of question the parties left to the arbitrator to decide.

Supreme Court decisions are quite clear that the courts should not leap into the arbitration process too quickly. I need not repeat here the reasons for this approach; they are set out in detail in the famous trilogy. United Steelworkers of America v. Enterprise Wheel & Car Corp., supra; United Steelworkers of America v. Warrior & Gulf Nav. Co., supra; United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).[5] It used to be that the attempt to obtain court review of the merits of an arbitration award was made under the guise that the issue was so clear it was not arbitrable. But the trilogy settled that old fight. This case shows the same attempt under the guise that the arbitrator has exceeded his authority, and it should meet with no greater success.

---

5. For examples of judicial reluctance since Enterprise to review an arbitrator's decision, see, e. g., Ficek v. Southern Pac. Co., 338 F.2d 655, 657 (9th Cir. 1964), cert. denied, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965); Avco Corp., etc. v. Mitchell, 336 F.2d 289, 291 (6th Cir. 1964); Minute Maid Co. v. Citrus, etc., Workers, 331 F.2d 280 (5th Cir. 1964) (per curiam).