Arbitration between **SHEET METAL CONTRACTORS ASSOCIATION OF NEW YORK CITY, Inc.,**

and

**Mechanical Contractors Association of New York, Inc., Petitioners,**

v.

**LOCAL UNION NO. 28 OF SHEET METAL WORKERS INTERNATIONAL ASSOCIATION OF GREATER NEW YORK, Respondent.**

No. 69 Civ. 2437.

United States District Court
S. D. New York.
June 25, 1969.

Rosenthal & Goldhaber, Brooklyn, N. Y., for Sheet Metal Contractors Ass'n of New York City, Inc.

Breed, Abbott & Morgan, New York City, for Mechanical Contractors Ass'n of New York, Inc.

Cohn & Glickstein, New York City, Samuel Harris Cohen, New York City, of counsel, for defendant.

MOTLEY, District Judge.

## DECISION ON MOTION TO CONFIRM AND ORDER

Petitioners move this court for an order confirming two awards made by an impartial arbitrator pursuant to the provisions of a collective bargaining agreement (the agreement) between petitioners (the employer associations) and the respondent (the union).[1] The motion is granted and the awards are confirmed.

The union opposed confirmation of the awards on three grounds: 1) the arbitrator exceeded his power in making the awards; 2) the arbitrator so imperfectly executed his power that a final and definite award upon the subject matter submitted was not made; and 3) the awards and the proceedings were contrary to the applicable provisions of the

---

1. A proceeding to confirm the awards was initially commenced in the Supreme Court of New York and removed to this Court on June 6, 1969.

agreement. The court concludes that the first and third grounds are essentially the same since they go to the power of the arbitrator under the agreement. The union asks that the awards be vacated and modified.

■■ This court has jurisdiction and power upon this motion to confirm, vacate, or modify these awards. In exercising its power, this court is barred from ruling upon the merits of the awards and from substituting its interpretation or construction of the agreement for that of the arbitrator. The court is limited to determining: 1) whether the opinions rendered and the awards made were within the authority granted the arbitrator by the terms of the agreement; 2) whether the arbitrator's opinions and awards draw their essence from the agreement; and. 3) whether the awards are definite enough to be enforceable. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); Torrington Co. v. Metal Products Workers Union Local 1645 UAW, AFL–CIO, etc., 362 F.2d 677 (2d Cir. 1966); Medo Photo Supply Corp. v. Livingston, 274 F.Supp. 209 (S.D.N.Y. 1967), aff'd 386 F.2d 451 (2d Cir. 1967); Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 261 F. Supp. 832 (D.N.J.1966); 29 U.S.C. § 185 (a).

The court holds that each of the foregoing questions must be answered in the affirmative upon the record and briefs before it.

The arbitrator's authority under the terms of the agreement is defined in Article IX. This Article provides for a reference, in the first instance, to a Joint Adjustment Board of "all matters of controversy or dispute arising out of the operation of [the] agreement or affecting relations between the parties thereto which cannot be settled by the duly authorized representative of the Union and the employer directly involved." (Article IX, Sec. 1). If the Board is "unable to adjust or settle any such controversy or dispute by conference or negotiation after one meeting, such controversy or dispute shall be immediately referred to a representative chosen by the Employer Associations, parties to the agreement, and one representative chosen by the Sheet Metal Workers International Association for adjustment or settlement by conference." (Article IX, Sec. 2). If such representatives shall fail "successfully to adjust or to settle the controversy or dispute within 24 hours" after its meeting, then the employer associations or the union may demand arbitration. (Article IX, Sec. 2). The arbitration is to be held before an impartial arbitrator named in the agreement. He is empowered to "hold hearings and reach a determination with all due speed, but not later than 48 hours after completion of the submission of the issue to him. (Article IX, Sec. 2, ¶ 2). He is specifically empowered to determine "whether or not the Employer or the Union violated the Agreement." (Article IX, Sec. 2, ¶ 3). Moreover, the arbitrator is granted the authority to determine "what steps shall be taken to remedy the violation" if he shall find that either the employer association or the union violated the agreement (Article IX, Sec. 2, ¶ 3). The employer associations or the union "shall have five days to comply or to start to comply with the award." (Article IX, Sec. 2, ¶ 3). In the event a question arises with respect to compliance with the award of the impartial arbitrator, the question of compliance shall be, according to the agreement, referred back to the arbitrator. In such event, the arbitrator's power is limited. He has power to determine "solely whether or not the Employer has complied; if not, what still remains to be done to comply and to direct the Union to terminate a strike, if compliance has been found; or to instruct the Union to furnish manpower to enable the Employer to complete compliance." (Article IX, Sec. 2, ¶ 7). The

union's right to strike arises upon the employer association's failure to comply within five days of an award in favor of the union. (Article IX, Sec. 2, ¶ 4). The employer associations apparently have the right to lock out the union upon an award in its favor with which the union has failed to comply. (Article IX, Sec. 3). Under Article IX, the exclusive remedy available to the employer association or the union in the event of a dispute involving compliance by either party with the terms of the agreement is the remedy set forth therein. (Article IX, Sec. 2, ¶ 5).

█ In this case, two disputes were referred to the arbitrator when the Joint Adjustment Board deadlocked with respect to each issue. The first dispute related to the critical manpower shortage in the construction industry. The manpower dispute was referred to the arbitrator when the Sheet Metal Workers International Association refused to accept jurisdiction to sit in on any dispute arising under the agreement as provided in the agreement. (Article IX, Sec. 2, ¶ 1). On September 25, 1968 and again on October 10, 1968, the impartial arbitrator held the required hearings relating to the manpower dispute. This dispute arose under Article III of the agreement which provides as follows:

"Section 1. The Union agrees to furnish at all times to the Employer, duly qualified journeymen sheet metal workers and registered apprentices in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under conditions specified in this Agreement."

At the conclusion of the hearing held on September 25, the arbitrator proposed: 1) that the union undertake immediately to bring into its membership 100 new journeymen sheet metal workers; 2) that these 100 journeymen be brought into the industry through the established procedures of the union's Constitution which calls for qualification of such new journeymen by a Board of Examiners; 3) that there be established an advisory committee to the union and the Board of Examiners; and 4) that he continue his jurisdiction of the dispute because, in his words, "the solution to this dispute has to be worked out rather than resolved by directive." The arbitrator then requested a report on the extent of the existing and anticipated shortage and set October 10, 1968 as the hearing date for a progress report on the new journeymen. (Opinion and Award, 10/10/68, pp. 1–2).

On October 10, 1968 a further hearing was held. At that hearing, the employer associations and the union submitted information which they had gathered on the extent of the shortage of journeymen. They disagreed, however, as to the number of journeymen needed at that time and in the foreseeable future. The arbitrator found as a result of the hearing that "there is a very serious shortage and that for the present and in the immediate future, additional journeymen will be needed to enable the Contractors to handle the work on hand and for which, backlogs have developed." (Opinion and Award 10/10/68, p. 2). The arbitrator then noted in his decision of October 10, which followed the hearing, that the induction of 100 new journeymen into the membership of the union manifestly could not be accomplished overnight. He further observed that the union should not be asked to accept unqualified persons as journeymen; but he ruled that qualified persons from all sources should be given the opportunity without discrimination to take the examinations prescribed by the Board of Examiners (Opinion and Award, 10/10/68, p. 2). He then noted that about 200 persons had applied for acceptance as journeymen and that the union had scheduled tests for November 2 and 16, 1968, after which, he anticipated, the 100 journeymen would be available for work. (Opinion and Award, 10/10/68, pp. 2–3).

The arbitrator then ruled that the most immediate and practical way the existing manpower shortage could be dealt with was through the admission

of qualified employees on a permit basis. The arbitrator found that permits had been issued in the past. He found, additionally, that at that time approximately 200 employees were working in the area on permits which had already been issued by the union. The arbitrator then ruled that there should be an increase of 250 permit men for emergency employment only, each permit being for a period of 90 days from employment, and renewable only upon the further order of the arbitrator. Finally, the arbitrator ruled that the employment of the permit men would be subject to termination as the economic needs of the employer indicated without any claim to employment or damages for loss of employment against the employer associations or the union. The arbitrator continued his jurisdiction over the dispute. He provided for a hearing on 24 hours notice with respect to any necessity for the protection of the interests of the union or the contractor under the then existing circumstances. (Opinion and Award 10/10/68, pp. 3–4).

On April 10, 1969, the employer associations requested a further hearing regarding the manpower dispute which was held on May 2, 1969. (Petition, p. 4). At that hearing, the employer associations asked the arbitrator to direct the union to: 1) accept additional journeymen; 2) institute a pre-apprentice class and, 3) increase the number of permit men. The employer associations claimed: 1) although many workers had been admitted on a permit basis, there was still a shortage of permit men; 2) the union had refused permits to men who are qualified; and 3) the union had restricted the use of permit men "on jobs where regular journeymen had been laid off." (Opinion and Award, 5/9/69, p. 5).

The arbitrator had ordered by his award of October 10, 1968 that the union admit up to 250 permit men and 100 new journeymen.

The arbitrator found in his Opinion and Award which followed the May 2 hearing that there exists an extreme emergency in the construction industry with respect to the sufficiency of available manpower which was exacerbated by the union's refusal to permit certain workers to work overtime. These workers are referred to as non-key men and will be discussed infra with respect to the second dispute.

The arbitrator then ruled that: 1) it is "imperative" for the union to issue permits to as many men as possibly can be obtained to fill the jobs presently needed in construction; 2) these permits should run until June 30, 1969 at which time the existing agreement expires; 3) such men should be granted permits after a determination as to their competency by the union; 4) the union should extend itself to obtain as many permit men as possible; 5) the employer associations are entitled to propose permit men whom they are able to locate; 6) the union must issue permits to such employer recruits if they are members in good standing of bona fide building trades unions and the employers associations are willing to employ them; and 7) the union must allow the employer associations to assign permit men to the job with the flexibility necessary to obtain the greatest utilization of their services. (Opinion and Award 5/9/69, p. 5).

Each of the foregoing items constituted the arbitrator's determination as to what remained to be done by the union to effectuate compliance with its award of October 10, 1968 regarding the necessity for an additional 250 permit men. The goal of 250 additional permit men had not been reached. But because of the union's failure to admit 100 new journeymen and to issue permits to 250 additional workers, as previously ordered, and to permit non-key men to volunteer to work overtime in the emergency which exists, the arbitrator directed the union to issue as many permits to qualified workers as could be found to meet the emergency. (Opinion and Award, 5/9/69, pp. 4–5).

The arbitrator also ruled that it is "imperative" for the union to admit

additional journeymen in accordance with established procedures. At that time, the union had admitted only about 25 additional journeymen out of approximately 250 persons who had applied. The employer associations complained that they were not permitted to participate with the union in devising the tests and that the tests were inordinately severe. (Opinion and Award, 5/9/69, pp. 5–6). The arbitrator then ordered that the employer associations be permitted through their advisory committee to consult with the union about testing procedures for the new journeymen. He also directed that all steps be taken to facilitate the qualification of additional journeymen as quickly as possible. (Opinion and Award, 5/9/69, p. 6).

The arbitrator denied the request for the institution of a pre-apprentice class, ruling that the provisions of the contract with respect to apprentices must prevail. He noted, however, that the parties must provide in their present negotiations for the new contract for an enlargement of the present class of apprentices to meet the existing shortage as well as the prospective demands for sheet metal workers in New York City. Finally, he directed that the award regarding the manpower shortage, as previously granted, be carried out as quickly as possible in accordance with his enumeration therein of what remained to be done to effectuate compliance. (Opinion and Award, 5/9/69, p. 6).

The second dispute involves overtime work. On April 3, 1969 the employer associations requested a meeting of the Joint Adjustment Board to hear their complaint against the union for alleged violation of Article V, Sec. 5(a) of the agreement. That Section provides as follows:

"Section 5. During the last three months of the term of the within Agreement from April 1st, 1969 through June 30th, 1969, Local 28 on 30 days prior notice to the Association, may require that no overtime work be performed except in accordance with the following provisions:

"(a) Any restrictions against overtime during the aforesaid last 90 days of the Agreement term shall in no event be applicable to key-men who are defined generally as constituting draftsmen, foremen, and superintendents necessary to maintain the schedule for a normal 35 hour week; also shearmen, welders, cutters and brakemen necessary to supply the requirements for the shop work and erection work on the jobs."

The Board met on April 8, 1969 and again deadlocked on this issue. On the latter date, the employer requested a hearing before the arbitrator. The hearing was held on April 10, 1969. The issue before the Board and the arbitrator was:

"Is Local Union #28 guilty of violating Article V, Section 5(a) of the Agreement by refusing to grant overtime permits to key-men as defined in the Agreement." (Opinion and Award 4/10/69, p. 1).

Upon the hearing, the arbitrator found that at a regular and special membership meeting of the union on April 1, 1969 consideration was given to a recommendation of the union's executive board to the effect that no overtime be worked during the coming contract negotiations. There were approximately 800 members present. These members voted, unanimously, to refuse "voluntarily" to work overtime. Before the vote was taken the president of the union told members that the employers might object to the action and seek to have it reviewed. He also advised members they would be apprised of any decision of the arbitrator with respect to the union's actions. After the meeting, a postcard was sent to all union members signed by the president and the recording secretary and reads as follows:

April 8, 1969.
"Dear Sir and Brother:

"Please. be advised that at the Regular and Special membership meeting of Tuesday, April 1, 1969, there was a recommendation of the Executive

Board to the effect that NO OVER-TIME BE WORKED during the coming contract negotiations. After full and open discussion by the members present at the said meeting it was upon Motion duly made and seconded UNANIMOUSLY ADOPTED to the effect that the Members of Local Union 28 voluntarily refuse to work overtime.

"You will therefore be guided accordingly in conforming to the action taken at the Regular and Special meeting of April 1, 1969."

The foregoing facts were not disputed. (Opinion and Award, 4/10/69, pp. 2–3).

With respect to the foregoing facts, the union contended: 1) the membership had a legal right to "voluntarily" refuse to work overtime and, 2) Section 5(a) requires only such overtime for key-men as is "necessary to maintain the schedule for a normal 35 hour week" and only such overtime for shearmen, welders, cutters and brakemen as is "necessary to supply the requirements of the shop work and the erection work on the job." In regard to the latter contention, the union claimed that the burden was on the employer associations to show that the union was not issuing permits for overtime work "necessary to maintain the 35 hour week" or to meet "the requirements for shop and erection work on the job." (Opinion and Award, 4/10/69, p. 3).

The arbitrator ruled that under the existing circumstances the burden is not on the employer associations to prove that the overtime permits they are requesting are necessary for the purposes stated in the agreement. (Opinion and Award, 4/10/69, p. 3). He ruled that Article V, Section 4, of the agreement provides that during the first two years and nine months of the agreement "overtime permits are to be granted freely on telephone requests without any restriction or limitation whatever." He ruled further that a limitation can be imposed during the last three months, except for the reasons stated in Section 5(a).

(Opinion and Award, 4/10/69, p. 3). The arbitrator then concluded that under the terms of the contract, by which he acknowledged he was bound in making the decision, the union is required during the last three months of the agreement to grant overtime permits as freely as during the first two years and nine months in the case of the exceptions set forth in Section 5(a). (Opinion and Award, 4/10/69, pp. 3–4).

██ The arbitrator also ruled that under the circumstances of this case he did not believe the members were exercising a protected right "voluntarily" to refuse to work overtime. On the contrary, the arbitrator ruled that the recommendation of the union's executive board, the postcard, and the vote of the membership were in the nature of concerted action on the part of the union and its membership which is contrary to the spirit as well as the letter of the agreement. Accordingly, the arbitrator directed the union to issue and respond to overtime permits for key-men, shearmen, welders, cutters and brakemen in accordance with the provisions of Article V, Section 5(a) of the agreement. (Opinion and Award, 4/10/69, pp. 4–5).

The union then notified its members of the Opinion and Award of the arbitrator by letter; but it contained a postscript which advised the membership that "Section 1 of the United States Constitution prohibits 'involuntary servitude' and that the 'Members of the local union had the constitutional right to work or refuse to work as they see fit to do so.'" (Opinion and Award, 5/9/69, p. 2).

The employer association then requested a further hearing before the arbitrator in order to have him effect compliance with the award of April 10, 1969. The arbitrator subsequently notified all parties that he would consider the question of compliance with the April 10, 1969 award on May 2, 1969 prior to the hearing referred to, *supra,* on the manpower dispute. A compliance hearing was held on that date and the arbitrator

combined his Opinion and Award with respect to both disputes in an Opinion and Award dated May 9, 1969. This court has already referred to the arbitrator's Opinion and Award with respect to the manpower dispute as set forth in the May 9, 1969 Opinion and Award.

With respect to the overtime issue, the arbitrator found after the May 2 hearing that despite his decision of April 10, 1969 no key-men had worked overtime. (Opinion and Award, 5/9/69, p. 2).

Following the May 2 hearing, however, and prior to rendering his decision of May 9, the arbitrator sent to the parties a telegram in which he requested immediate response from them with respect to several matters, among which was authorization for all sheet metal workers, not merely key-men, to work overtime until June 30, 1969 because of the existing emergency without prejudice to the future contractual rights of the parties. The arbitrator advised in the telegram that the awards would follow the responses and would take the answers of

the parties into account. (Opinion and Award, 5/9/69, p. 2).

In response to that telegram, the union met on May 8. It voted to refuse to work overtime, that is, it refused to agree, although not required to, that all men other than key-men would work overtime in the emergency.[2] The union, of course, as the arbitrator ruled, had the right to take this position. He pointed out, however, that it underscored the importance of enforcing the corollary obligation which required that key-men work overtime during the last three months of the agreement. The arbitrator found as a fact that the agreement had been violated by the failure of any of the key-men to work overtime. (Opinion and Award, 5/9/69, p. 4). He, thereupon, directed the union to instruct its members by letter immediately that key-men must work overtime in accordance with the provisions of the agreement.[3]

For all of the foregoing reasons, the arbitrator's Opinions and Awards must be and they hereby are confirmed.

So ordered.

2. The arbitrator, by his telegram, continued the May 2 hearing until receipt of the replies of the parties. The union replied on May 8 and the arbitrator rendered his Opinion and Award on May 9. There is, therefore, no merit to the union's contention that the arbitration failed to comply with the provisions of Article X, Sec. 2, ¶ 2 requiring the arbitrator to hold a hearing and render a decision within 48 hours after the hearing.

3. The union stresses the fact that the agreement between the parties expires on June 30, 1969. This may or may not be true depending upon the action of the parties on the expiration date. Article

XVI provides for the continuation of the agreement after June 30, 1969 and during negotiations for a new agreement at the will of the parties. The agreement may, therefore, continue in effect and there is certainly no prohibition against the arbitrator continuing to further arbitrate or mediate these disputes pending a new agreement. In fact, if both parties' positions are taken in good faith with respect to the manpower shortage such continued arbitration or mediation with the present arbitrator, who is fully conversant with the facts and obviously impartial as reflected by his opinions, should probably continue pending a new agreement.