SCHOOL COMMITTEE OF LEOMINSTER *vs.* JOHN GALLAGHER & others.[1]

Worcester.    February 12, 1976. — March 24, 1976.

Present: KEVILLE, GRANT, & ARMSTRONG, JJ.

*School and School Committee.    Arbitration.    Contract,* Collective bargaining contract.

A finding made by an arbitrator in a proceeding under a collective bargaining agreement between a school committee and teachers that a vocational instructor was entitled to be paid at a rate set out in a salary schedule of the agreement applicable to vocational instructors with one or more academic degrees rather than at a somewhat lower rate set out in another schedule applicable to academic teachers was within the scope of the arbitrator's authority under the agreement. [198-201]

PETITION filed in the Superior Court on January 2, 1973, to vacate the award of an arbitrator.

---

[1] John Gallagher and other persons named individually and as representatives of Leominster Teachers Association, an unincorporated association.

The case was heard by *Meagher*, J.
*Sanford A. Kowal* (*Stanley A. Berkowitz* with him) for the plaintiff.
*Brian A. Riley* for the defendants.

GRANT, J. This is an application filed in the Superior Court by the school committee of Leominster (committee) to vacate an award made by an arbitrator appointed under the grievance provisions of the 1971-1972 collective bargaining agreement (agreement) between the committee and the teachers and vocational instructors then employed by the committee. See G. L. c. 71, § 38 (as amended through St. 1970, c. 780); G. L. c. 149, §§ 178I and 178K (both as in effect prior to St. 1973, c. 1078, § 1); G. L. c. 150C, § 11 (*a*) (inserted by St. 1959, c. 546, § 1). A final decree was entered denying the application and confirming the award. The committee appealed.

The controversy centers on whether Peter Sobel, who was employed as an instructor in the trade high school operated by the committee, was entitled to be paid at a rate set out in a salary schedule of the agreement apparently applicable to academic teachers or at a somewhat higher rate set out in another schedule apparently applicable to vocational instructors who had one or more academic degrees. On entering the system in 1964 Sobel possessed a bachelor's degree and was employed and paid as an academic teacher. He subsequently earned a master's degree, and in May of 1972 he received certification as a vocational teacher. He requested that he thereafter be paid in accordance with the higher paying schedule. The committee refused. The arbitrator decided in Sobel's favor and awarded him the difference between the lower and higher rates, retroactive to the date of his request.

Article XXVI ("SALARY") of the agreement provides that "[t]he salaries effective for the term of this [a]greement are set forth in Appendix A attached hereto and made a part hereof." Schedule A ("SALARY SCHEDULE") of Appendix A sets out six different salary schedules apparently applicable to teachers and instructors of

differing academic backgrounds and vocational achieve-ments.[2] Article II ("GRIEVANCE PROCEDURE") defines a "grievance" as a "claim based on an event or condition which involves the interpretation, meaning or application of this [a]greement . . .." Section 3 of that arti-cle establishes a four-level grievance procedure. Section 4 provides that "[a]ny grievance which alleges a violation by the [c]ommittee of . . . [a] provision of this [a]gree-ment and which has not been settled under the [griev-ance] procedure . . . may be submitted [to arbitration] by either party" within a prescribed period of time.

If the foregoing provisions stood alone, they would un-doubtedly have to be construed by us as authorizing the arbitrator to misinterpret the agreement so far as concerns the salary schedule applicable to one such as Sobel. See *School Comm. of Hanover* v. *Curry,* 369 Mass. 683, 685 (1976); *School Comm. of Braintree* v. *Raymond,* 369 Mass. 686, 690-691 (1976). The committee does not seri-ously contend otherwise. It points to other provisions of the agreement which, it says, require the conclusion that the arbitrator's decision and award were in excess of the authority delegated to him under the agreement. See G. L. c. 150C, § 11 (*a*) (3); *Trustees of Boston & Maine Corp.* v. *Massachusetts Bay Transp. Authy.* 363 Mass. 386, 390 (1973).

The committee points first to art. I ("RECOGNI-TION"), par. B, which provides that "[e]xcept as specifi-cally abridged, delegated, granted or modified by this [a]greement . . . all of the rights, powers and authority held by the [committee] prior to the effective date of said [a]greement are retained by the [committee], and the ex-ercise of said rights, powers and/or authority shall not be

---

[2] The schedules are successively entitled (1) "BACHELOR (VOC. CERT.)," (2) "MASTERS OR VOCATIONAL CERTIFICATION + 60", (3) MASTER'S + 15 OR VOC. CERT. + 90," (4) "MASTER'S + 30 OR VOC. CERT. + 120 AND/OR BACHELOR'S," (5) "MAS-TER'S + 45 OR VOC. CERT. + BACHELOR'S + 15," and (6) "DOC-TOR'S DEGREE." The committee contended before the arbitrator that Sobel belonged in step 12 of the second schedule. The arbitrator placed him in step 12 of the fifth schedule.

subject to arbitration." That paragraph, standing by itself, answers nothing; it assumes content and meaning only in the context of statutory provisions (to be discussed) and other provisions of the agreement. The committee points to the following provisions of the agreement: (1) art. II, § 5, which states in pertinent part that "[t]he arbitrator will be without power or authority to make any decision which requires the commission of an act prohibited by law[3] or which is violative of the terms of this [a]greement"; (2) art. XXIII ("CONDITIONS RELATING TO SALARY"), par. H, which states, "The regulations pertaining to the salary schedule for academic teachers shall apply to the [t]rade [s]chool salary schedule. Instructors in shop or related work who are accredited by the Vocational Division of the State Department of Education shall be placed on the schedule for a [b]achelor's degree"; and (3) art. XXIV ("GENERAL"), par. I, which states that "[a]ny matter not covered by this contract or the school policy shall be decided at the discretion of the . . . [c]ommittee for the duration of this contract period."[4]

We commence our analysis by first considering the provisions of art. XXIII, par. H ([2] above). The committee emphasizes the word "regulations" which appears in the first sentence of the paragraph and ignores the entire second sentence. The agreement itself contains no express in-

---

[3] The committee develops no real argument that the arbitrator's decision and award "requires the commission of an act prohibited by law." See G. L. c. 149, § 178I. The committee refers in the abstract to G. L. c. 43, § 33, which provides that the school committee in a city "shall make all reasonable rules and regulations, consistent with law, for the management of the public schools of the city," and to G. L. c. 71, § 37, which provides that a school committee "shall have general charge of all the public schools." The committee nowhere refers to the requirement of G. L. c. 71, § 38, that a school committee "shall elect and contract with the teachers of the public schools."

[4] The committee appears to proceed on the assumption that the last quoted provision is to be read as identifying two separate matters which are to be "decided at the [committee's] discretion," namely, "[a]ny matter not covered by this contract" and "[a]ny matter of school policy." We proceed on the same assumption.

dication of the sense in which the quoted word was used.[5] However, both sentences refer explicitly to the "salary schedule", and we think that the entire paragraph, when read in the light of the titles assigned to the various salary schedules (n. 2, *supra*), emerges as nothing more than a rule for determining the pay to which vocational teachers were to be entitled by equating vocational certification with academic degrees. For example, the first schedule, entitled "BACHELOR (VOC. CERT.)," appears to have been intended to place an instructor having only a vocational certification on an economic par with a teacher who had a bachelor's degree. Indeed, that is the very thing that the second sentence of par. H says. The arbitrator may have misinterpreted the salary schedules (a matter on which we express no opinion), but we see nothing in art. XXIII, par. H, which lends support to the committee's contention that the arbitrator exceeded the authority delegated to him under the agreement.

Article XXV ("COMPLETENESS OF AGREEMENT") provides in its first sentence that "[t]his contract incorporates the entire understanding of the parties on all issues which were or could have been the subject of negotiations." Article XXVI provides that "[t]he salaries effective for the term of ... [the a]greement are set forth in" the appendix thereto. The appendix sets out six various schedules (note 2, *supra*) apparently applicable to teachers and instructors of differing academic backgrounds and vocational achievements. We think it clear that the intention was to provide for the salary to be paid each teacher and instructor employed by the committee. Accordingly, we cannot hold as matter of law that the question of what Sobel should have been paid was a "matter not covered by ... [the] contract" within the meaning of art. XXIV, par. I ([3] above). It may be that similar rea-

---

[5] The committee's brief makes no effort to equate the word "regulations" with the words "school policy" which appear in art. XXIV, par. I ([3] above).

soning on the part of the committee explains its failure to identify any particular term of the agreement which may have been violated by the decision and award of the arbitrator. See art. II, § 5 ([1] above).

We come now to the committee's remaining contention, that by his decision and award the arbitrator arrogated to himself the right to determine a matter of "school policy" as those words were used in art. XXIV, par. I ([3]above). It appears from the arbitrator's decision that the committee contended before him that it had a "policy of many years' standing that a teacher [such as Sobel] who enters the system with academic degrees and no vocational certification may not thereafter move horizontally across the [salary] schedules to be placed on a vocational schedule when he becomes vocationally certified."[6] The reason given for any such policy is revealing. According to the superintendent of schools, the reason was "to encourage vocational teachers to earn academic degrees and to provide no specific financial encouragement to academic teachers [such as Sobel] to become vocationally certified." The superintendent explained that "a teacher who enter[ed] the system with both academic degrees and vocational certification ... [was] entitled to the highest placement on the suitable vocational teacher's schedule," the one the arbitrator applied to Sobel.

A policy of paying a higher rate to an entering teacher who possesses both an academic degree and a vocational certification may amount to nothing more than the recognition of practical necessity. A policy of refusing to pay the same higher rate to a present member of the system who adds a vocational certification to his academic degree is the practical equivalent of a policy of paying the present member as little as possible. Compare *Black* v. *School Comm. of Malden,* 369 Mass. 657, 662, n. 5 (1976). It is

---

[6] In several parts of the arbitrator's decision it is difficult to distinguish between his summaries of the testimony presented to him and his actual findings of fact. It is not clear that the arbitrator actually found that there had been such a policy as that urged by the committee.

School Committee of Leominster *v*. Gallagher.

not an educational policy of the type which a school committee can properly refuse to submit to the collective bargaining process or refuse to delegate to an arbitrator for determination by him. Contrast *School Committee of Hanover* v. *Curry,* 3 Mass. App. Ct. 151, 156-159 (1975); *S. C.* 369 Mass. 683, 685 (1976); *School Committee of Braintree* v. *Raymond,* 369 Mass. 686, 687, 690 (1976). It is a policy of the very type which the Legislature contemplated would be subjected to the collective bargaining process by G. L. c. 149, § 178I (see *Fitchburg Teachers Assoc.* v. *School Comm. of Fitchburg,* 360 Mass. 105, 106-107 [1971]; *Kerrigan* v. *Boston,* 361 Mass. 24, 26-28 [1972]), and which can be delegated to an arbitrator for his determination.[7]

We express no opinion on the question whether a school committee could properly refuse to bargain over a policy such as that urged in the present case. We conclude, however, that clearer language than that which was employed here was necessary to effectuate a mutual intention to exclude any such policy from the jurisdiction and scrutiny of an arbitrator. In reaching this conclusion we have not overlooked the case of *Torrington Co.* v. *Metal Prod. Workers Union Local 1645,* 362 F. 2d 677 (2d Cir. 1966), which was decided by a divided panel and which we have not had occasion either to approve or disapprove. See *Cape Cod Gas Co.* v. *United Steel Workers, Local 13507,* 3 Mass. App. Ct. 258, 263-264, n. 4 (1975).

*Decree affirmed.*

---

[7] See the *Braintree* case, 369 Mass. at 688-689, for discussion under the present statutory provisions.