**LAUNDRY, DRY CLEANING AND DYE HOUSE WORKERS INTERNATIONAL UNION, LOCAL 93, OF SPRINGFIELD, MISSOURI, Appellee,**

v.

**Robert M. MAHONEY et al., Appellants.**

**No. 72–1731.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1973.

Decided Jan. 22, 1974.

Rehearing and Rehearing En Banc Denied Feb. 13, 1974.

Donald W. Jones, Springfield, Mo., for appellants.

Benjamin J. Francka, Springfield, Mo., for appellee.

Before MEHAFFY, Chief Judge, and GIBSON, LAY, HEANEY, BRIGHT, ROSS, STEPHENSON and WEBSTER, Circuit Judges, *en banc*.

HEANEY, Circuit Judge, with whom LAY, BRIGHT and WEBSTER, Circuit Judges, join.

This matter comes before the Court *en banc* on a petition for rehearing. The sole issue is whether the trial court erred in requiring the parties to a collective bargaining agreement to submit a mid-contract wage dispute to binding arbitration.[1]

On August 8, 1968, the Union entered into a collective bargaining agreement with the then owner of the business. Article XX of the agreement provides:

*Section 1.* This agreement shall remain in full force and effect until August 8, 1973, and from year to year thereafter, unless sixty (60) days prior to August 8, 1973, or any year thereafter, the Union notifies the Employer or the Employer notifies the Union of its desire to terminate or modify this Agreement. This notice must be written.

*Section 2.* Either the Employer or the Union shall have the right as of August 8, 1971, to reopen for negotia-tion on the subject of wages and seniority only, upon either party giving written notice to the other at least sixty (60) days prior to such reopening date. In the absence of such notice, the existing conditions shall continue to remain in effect until the expiration date of the Agreement.

Thereafter, most of the assets of the business were sold to the Bormon Investment Company, and that firm became obligated to abide by the terms of the agreement as a successor employer.

The Union and the Employer exercised their option to reopen the contract on wages and seniority by giving a timely notice. The parties were unable to reach an agreement on either issue. The Union demanded that the unresolved issues be submitted to arbitration. The Employer refused on the grounds that it was not obligated to arbitrate these issues. The Union then brought an action seeking to require the Employer to submit the dispute to arbitration.

The agreement generally establishes wage rates and working conditions. It specifically provides:

### ARTICLE I.

#### Purpose

*Section 1.* It is the intent and purpose of the parties hereto, to set forth herein their basic agreement covering wages, hours of work, and conditions of employment to be observed between the parties hereto, and to provide procedures for the prompt, and equitable adjustment of all grievances and disputes arising between the Employer and the Union or any employee or employees covered by this Agreement.

\*　　\*　　\*　　\*　　\*　　\*

### ARTICLE XIII.

#### No Strike or Lockout

*Section 1.* There shall be no strikes, stoppages, slowdowns, or con-

---

1. Initially, a divided panel affirmed the District Court holding that the parties were required to submit the dispute to binding arbitration. Laundry, Dry Cleaning and Dye House Workers International Union, etc. v. Robert M. Mahoney et al., No. 72–1731, filed August 16, 1973 (unpublished).

certed activity interrupting or interfering with production, or lockouts, for any reason whatsoever during the life of this Agreement.

It also contains a grievance and arbitration clause which reads as follows:

## ARTICLE XIV.

### Grievance and Arbitration

*Section 1.* It is hereby agreed that the Union may have one (1) duly accredited representative to be known as the "Steward" in each plant to be selected by the Union. It shall be his or her duty to receive complaints and to present them to the management. * * *

*Section 2.* In order to determine the existence and/or validity of a grievance, the Steward shall notify the Plant Manager or his designated representative of the charge by an employee, and as soon as practicable, the Steward and the Employer representative shall discuss the matter with the view of resolving the issue if possible. * * *

*Section 3.* If the grievance is not settled in the manner set forth in Section 2 within two (2) working days after the Steward has first discussed it with the Plant Manager, it shall be reduced to writing and considered between the Business Agent and Company representatives.

*Section 4.* If not settled within five (5) working days as set forth in Section 3, the matter shall be referred to arbitration.

*Section 5.* Each party shall select an arbitrator [.] * * * Should there be no agreement between the two arbitrators as to the third arbitrator, application shall be made to the Federal Mediation and Conciliation Service in Washington, D. C., for a panel of five (5) nominees. The parties shall alternate in striking two names each and the remaining shall be the impartial arbitrator. The arbitrator shall not have the power to add to, subtract from, or change the terms of the contract. The decision of a majority of the panel shall be final and binding. * * *

* * * * * *

## ARTICLE XVIII.

### Savings Clause

*Section 1.* If any law now existing or hereinafter enacted, or any proclamation, regulation, or edict of any state or national agency shall invalidate any portion of this Agreement, the entire Agreement shall not be invalidated, and either party hereto, upon notice to the other, may reopen for negotiation the invalidated portion, and if agreement thereon cannot be reached, within thirty (30) days, either party may submit the matter to arbitration as herein provided.

The matter was submitted to the trial court on cross-motions for summary judgment. The court initially determined that the question of arbitrability was for it to decide. It then held, on the authority of the United Steel Workers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), that the dispute was arbitrable because no forceful evidence of an intent or purpose to exclude the dispute from arbitration was evidenced.

The Employer argues on appeal: (1) that they are under no obligation to arbitrate any wage and seniority issues; (2) that their only obligation under the agreement is to negotiate on the two issues, and they have fulfilled that obligation; (3) that arbitration is only available to resolve employee grievances, and then only after such grievances have been processed in accordance with Sections 1, 2, 3 and 4 of Article XIV of the agreement; and (4) that, here, no grievance exists, and that the dispute between the Employer and the Union was not processed in accordance with the above sections.

■ The trial court correctly held that the issue of arbitrability was one for it to decide. John Wiley & Sons v.

Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Drake Bakeries v. Local 50, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

■ The trial court also properly decided that the midterm contract dispute between the Employer and the Union over wages and seniority is an arbitrable one.

*Warrior* teaches:

The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or agreed to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

\* \* \* \* \* \*

\* \* \* In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator.

United Steel Workers v. Warrior and Gulf Navigation Co., 363 U.S. *supra* at 582, 584–585, 80 S.Ct. 1347, 1353, 1355. *Accord,* Local Union No. 4, IBEW, AFL–CIO v. Radio Thirteen-Eighty, Inc., 469 F.2d 610 (8th Cir. 1972); Builders Ass'n of Kansas City v. Greater Kansas City Lab. D. C., 326 F.2d 867 (8th Cir.), cert. denied, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964).[2]

We are convinced, as was the trial court, that it cannot be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute.[3] Although the "Grievance and Arbitration" clause speaks of employee grievances, the "purpose" clause of the agreement asserts that *the agreement is intended to provide "procedures for the* \* \* \* *equitable adjustment of* all grievances and *disputes arising between the Employer and the Union* \* \* \*".". If the contract is to be read as a whole,

2. *See,* 85 Harv.L.Rev. 636 (1972); Griswold, The Supreme Court 1959 Term, 74 Harv.L. Rev. 81, 181 (1960); 59 Mich.L.Rev. 454 (1961); 45 Minn.L.Rev. 282 (1960); The New Federal Law of Labor Injunctions, 79 Yale L.J. 1593 (1970).

3. In *Hughes Tool Co.,* 36 Lab.Arb. (1960), an arbitrator reached a result generally inconsistent with that reached here. The arbitrator stated:

Both parties referred in their respective arguments to the recent decisions of the United States Supreme Court in \* \* \* American Manufacturing Co., [and] Warrior \* \* \*. Those cases all dealt, however, with the power of federal courts, rather than with the discretion of arbitrators. Construing those cases in a way most favorable to the Union here involved would lead at most to the conclusion that if the parties had litigated this issue in federal court instead of submitting it to private arbitration, the court would have ruled that the issue was arbitrable; or that, conversely, if the arbitration decision in this case were in favor of arbitrability, the court would decline to vacate it on review.

*Id.* at 1129.

as it must, Montana-Dakota Utilities Co. v. N. L. R. B., 455 F.2d 1088 (8th Cir. 1972), effect should be given to this language. The savings clause speaks of submitting matters other than grievances to "arbitration as herein provided," thus negating an intent to limit the arbitration clause in the manner suggested by the appellant. Moreover, the collective bargaining agreement includes an absolute "no strike, no lockout" clause. This inclusion lends support to the view that the collective bargaining agreement was intended to completely effectuate the federal policy of promoting industrial stabilization through collective bargaining.[4]

In summary, we not only fail to find forceful evidence of a purpose to exclude the mid-contract wage dispute from arbitration, but we find evidence of a contrary purpose. The *Warrior* rule is thus triggered.[5]

Concern has been expressed that the effect of this opinion will be to make midterm wage disputes in multi-year contracts subject to arbitration whenever a collective bargaining agreement contains an arbitration and a no-strike clause. We find no cause for such concern. The parties to a collective bargaining agreement can, by plain language, exclude such dispute from arbitration. They can lift the "no strike, no lockout" pledge in such circumstances,

*see,* United Steel Workers v. Warrior and Gulf Navigation Co., *supra,* n. 5, 579, 80 S.Ct. 1347, or permit the pledge to remain in effect and require the dispute to be resolved by bargaining or not at all. All that is necessary is that the parties make their intent to exclude arbitration clear. They have not done so here.

■ We find no merit to the Employer's contention that the judgment against three minor defendants should be set aside because it was imposed on them without the prior appointment of a *guardian ad litem.* The first exception to Rule 17(b), 28 U.S.C., permits a partnership to be sued in its common name for the purpose of enforcing against it a substantive right existing under the laws of the United States. The right to arbitrate is such a right.

Moreover, the trial court properly found that the minors' interests were adequately protected by the presence of their parents as defendants. *See,* Westcott v. United States Fidelity and Guaranty Company, 158 F.2d 20 (4th Cir. 1946); Rutland, Administrator v. Sikes, et al., 203 F.Supp. 276 (E.D.S.C.), aff'd, 311 F.2d 538 (4th Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1871, 10 L.Ed.2d 1053 (1963).

The judgment below is affirmed by an equally divided court.

---

4. * * * The present federal policy is to promote industrial stabilization through the collective bargaining agreement. * * * Complete effectuation of the federal policy is achieved when the agreement contains both an arbitration provision for all unresolved grievances and an absolute prohibition of strikes, the arbitration agreement being the "*quid pro quo*" for the agreement not to strike. Textile Workers v. Lincoln Mills, 353 U.S. 448, 455, 77 S. Ct. 912, 1 L.Ed.2d 972.
United Steel Workers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960).

5. The demands of the Steel Workers trilogy were recently reiterated in Gateway Coal Company v. United Mine Workers of Amer-

ica, et al., 414 U.S. 368, 94 S.Ct. 629, 38 L. Ed.2d 583 (January 8, 1974), in which a general arbitration clause was held applicable to safety disputes.
The following cases are distinguishable on their facts: West Coast Telephone Co. v. Local U. No. 77, Int. Bro. of Elec. Wkrs., 431 F.2d 1219 (9th Cir. 1970); Federal Labor Union No. 18887 v. Midvale-Heppenstall Co., 421 F.2d 1289 (3rd Cir. 1970); Radio Corp. of Am. v. Association of Scientists & Pro. Eng. P., 414 F.2d 893 (3rd Cir. 1969). In each case, the collective bargaining agreement made it clear that the issue the Union sought to arbitrate was, in fact, non-arbitrable. *See also,* Firestone Tire and Rubber Co. v. International Union, Etc., 476 F.2d 603 (5th Cir. 1973); Ford v. General Electric Co., 395 F.2d 157 (7th Cir. 1968).

WEBSTER, Circuit Judge (concurring).

I concur in Judge Heaney's opinion on the issue of arbitrability, and in the result. Because Judge Heaney's opinion does not deal with the contractual limitations on the powers of the arbitrator, [1] and because Judge Ross sees this clause as critical to his analysis, I feel obliged to state my views on that subject.

Given the now clearly stated Congressional and judicial policy favoring the use of arbitration in exchange for a no-strike clause in the collective bargaining arena, it does not follow that the arbitrator can or will in each case grant the relief sought by the party aggrieved. We do not know, for example, whether the arbitrator will determine that a reopened issue is an exception to the no-strike provision. Thus, he might, under appropriate findings, order the parties to resume bargaining or hold that the union is free to strike absent a resolution of the dispute. Or he may, upon an examination of the contract in the light of the federal labor common law, Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), hold that he is without power to grant certain relief requested by the union.[2]

In F & M Schaefer Brewing Co. v. Local 49, International Union of United Brewery, etc., 420 F.2d 854 (2d Cir. 1970), the court reversed the trial court's order staying arbitration. The trial court had held that since the arbitrator was not given the power to fix new rates, submission of the grievance to him would require him to exceed his powers. The Second Circuit disagreed, saying that this question "would go only

to the remedy . . .." 420 F.2d at 856.

[I]n *Torrington*, we pointed out that the question of the arbitrator's authority to make a particular award was best left to the arbitrator initially, so that the court could receive "the benefit of the arbitrator's interpretative skills as to * * * his contractual authority." 362 F.2d at 680 n. 6.[3] Here, we are asked to prevent arbitration in the first place. To do so on the theory that we should not require a useless act misconceives the possibilities open to an arbitrator and ignores the explicit lesson of the Trilogy . . . that "[t]he processing of even frivolous claims may have therapeutic values."

420 F.2d at 856. (footnote added)

In Tobacco Workers International Union, Local 317 v. Lorillard Corp., 448 F. 2d 949 (4th Cir. 1971), the Fourth Circuit construed an almost identical contractual limitation in this way:

The quoted sentence does not, we think, limit the arbitrator's "jurisdiction" over those grievances which are subject to arbitration. It is not a limitation on arbitrability, but is instead merely a limitation on the arbitrator's power to fashion an award. Carey v. General Electric Co., 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964). As such it is inappropriate for a court to decide that such a clause excludes the remedy sought prior to arbitration. It is best to leave this question to the arbitrator initially in order to receive "the benefit of the arbitrator's interpretive skills as to * * * his contractual authority." Torrington Co. v. Metal Products

---

1. * * * The arbitrator shall not have the power to add to, subtract from, or change the terms of the contract. The decision of a majority of the panel shall be final and binding. * * * Article XVII, Section 5.

2. *See* Note, Mid-Term Modification of Terms and Conditions of Employment, 1972 Duke L.J. 813, 825–31.

3. Torrington Co. v. Metal Products Workers, 362 F.2d 677, 680 n. 6 (2d Cir. 1966) : [W]e think more exhaustive review of this question is appropriate after the award has been made than before the award in a suit to compel arbitration. . . .

Workers Union Local 1645, 362 F.2d 677, 680 n. 6 (2d Cir. 1966).

448 F.2d at 955.

And in International Ass'n of Machinists v. Howmet Corp., 466 F.2d 1249 (9th Cir. 1972), the Ninth Circuit said:

> We agree with the Fourth Circuit that a clause limiting the power of the arbitrator to add to, subtract from, or alter the provisions of the agreement does not affect the jurisdiction of the arbitrator, but merely limits his power to fashion an award. Tobacco Workers International Union, Local 317 v. Lorillard Corp., 4 Cir., 1971, 448 F.2d 949, 955.

466 F.2d at 1252–53.

The point, it seems to me, is that in this case there is no "clear and unambiguous" evidence of non-arbitrability,[4] and we are bound by the Steelworkers' trilogy in such circumstances to hold the issue arbitrable, as Judge Heaney has well demonstrated. We are not to reach the merits by interpretating the scope of the arbitrator's power to award specific relief, or by drawing an inference of non-arbitrability from a contractual limitation on his power in relation to his duties. The courts will be available to test the lawfulness of the arbitrator's decision in an enforcement proceeding.[5] We need not presently assume that he will abuse his contractual power to resolve disputes, nor should the scope of that power be confused with the arbitrability of the dispute.[6]

ROSS, Circuit Judge, with whom MEHAFFY, Chief Judge, and GIBSON and STEPHENSON, Circuit Judges, join.

We accept the statement of the case contained in Judge Heaney's opinion. However, we believe that it is clear from reading the contract as a whole that at the time it was negotiated it was not intended by either party to provide for arbitration of wage disputes arising out of the reopening clause. It is clear from Judge Heaney's opinion that Articles I, XIII, XIV, XVIII, and XX are the clauses he relies upon in his determination that the arbitration clause is susceptible to the interpretation that it covers wage disputes under the reopening clause. We do not read those clauses in the same way.

Article I, the purpose clause, merely indicates that the contract as a whole, shall "provide procedures for the prompt, and equitable adjustment of all grievances and disputes arising between the Employer and the Union or any employee or employees covered by this Agreement." It does not say nor imply, in our opinion, that all disputes shall be submitted to *arbitration*. The contract specifically provides for *negotiation* of wage disputes on reopening in Article XX, and *arbitration* of grievances in Article XIV.

A careful reading of Article XIV, as heretofore set forth, shows clearly that it is a *narrow* arbitration clause limited in its scope to *grievances* between the employees and management. The reference to the Steward in Section 1, conferences between the Steward and the Plant Manager in Section 2, written submission and consideration by the Business Agent and Company representatives in Section 3, and reference to arbitration if there is no solution after five (5) working days in Sections 4 and 5 make it absolutely clear that the intention of the parties was to provide for arbitration of *employee grievances* and not *wage disputes* on reopening. There is no reference in this clause to a Union

---

4. Procter & Gamble Independent Union v. Procter & Gamble Mfg. Co., 298 F.2d 644 (2d Cir. 1962).

5. *See* United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

6. *See* Safeway Stores v. American Bakery & Confectionery Workers International Union, Local 111, 390 F.2d 79, 81 (5th Cir. 1968): "[T]here may be in these controversies two distinct problems. One is whether the grievance is arbitrable. The other is whether the award of the arbiter is to be enforced. To order arbitration is not to approve in advance all, or for that matter, any thing that the arbiter does."

Bargaining Committee—only to a Union Steward and Union Business Agent, and if there was any doubt whatsoever that this clause was not intended to apply to wage negotiations, which we do not believe there is, it is laid to rest finally and absolutely by the insertion of this sentence: "The arbitrator shall not have the power to add to, subtract from, or change the terms of the contract." [1] Nothing in Judge Heaney's opinion or in the briefs provides a logical explanation of how an arbitrator can change the wages of the employees of this company without specifically violating this very explicit provision of the Agreement.

Article XVIII, the savings clause, is an express recognition by the parties that the arbitration clause does *not* cover all disputes under the contract. It makes an exception to the narrow scope of arbitration provided in Article XIV and specifically provides for arbitration in cases in which some portion of the Agreement is invalidated by law. The failure of the parties to similarly provide for arbitration of wage disputes on reopening in Article XX, after providing for it specifically for employee grievances and invalidation of a portion of the contract by law, is an additional indication to us that it was not intended to apply to wage disputes on reopening.

It is apparent to us from an examination of the entire contract that the Union, having for some reason failed to reserve the right to strike if wage negotiations on reopening proved fruitless, decided to ask the federal courts to make up for this negotiating deficiency by construing the contract to include wage disputes as an arbitrable matter, in direct contravention of the obvious intent of the Agreement.

The only possible valid reason we can perceive for requiring arbitration of this wage dispute is if Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960), and Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) stand for the proposition that the failure to specifically exclude wage disputes from arbitration in any labor contract automatically makes wage disputes subject to arbitration. We do not believe this was the intent of either case.

The *Steelworkers* cases are often cited for the proposition that the no-strike clause is the quid pro quo for the arbitration clause and *Warrior* is cited for

---

1. *See* West Coast Telephone Co. v. I. B. E. W., Local 77, 431 F.2d 1219, 1221 (9th Cir. 1970), where the court held that a wage issue could not be resolved by arbitration because of a similar clause. Judge Heaney's opinion, in footnote 5, indicates that this case can be distinguished on its facts since "the collective bargaining agreement made it clear that the issue the Union sought to arbitrate was, in fact, non-arbitrable." But the reason the court held the wage dispute not to be arbitrable, was the inclusion of just such a clause as is present in this contract. The court stated:

Thus the company seeks a change in the terms of the written agreement. It can be said with positive assurance that such an issue is not arbitrable under the agreement in question. The arbitration clause of the contract expressly provides that the arbitrator "shall have no power to destroy, change, add to or delete from its terms."

The district court correctly determined that the issues were not arbitrable and

that the court should proceed to a consideration of the reformation issues. (Footnote omitted.)

*Id.* at 1221.

Judge Webster, in his concurring opinion, and without expressing an opinion as to the legality of *any* change to be ordered by the arbitrator, suggests that the arbitrator may have several options. These include an order to resume bargaining or an order holding "the union is free to strike." Any order permitting the union to strike would violate the no-strike clause which prohibits strikes "for any reason whatsoever" and would be just as much a prohibited change in the terms of the contract as raising the wages set forth therein. The suggestion also is not practical in view of the fact that the contract was due to expire on August 8, 1973. Realistically, the only options open to the arbitrator are to raise wages or let them remain the same and that decision should be made now rather than forcing the parties to possibly go through an enforcement proceedings after the award is made.

the proposition that arbitration should be required "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Steelworkers v. Warrior & Gulf Co., *supra*, 363 U.S. at 582–583, 80 S.Ct. at 1353. But we should remember that this language must be read in light of the facts of each case and in light of other equally strong language that "*a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Id.* at 582, 80 S.Ct. at 1353 (emphasis supplied).

*American Mfg. Co.* involved a grievance filed on behalf of an employee over reemployment rights after a disabling accident. The contract provided that "[a]ny disputes, misunderstandings, differences or grievances arising between the parties as to the meaning, interpretation and application of the provisions of this agreement, which are not adjusted as herein provided, may be submitted to the Board of Arbitration for decision. . . ." The employer relied on a clause which stated as follows:

> The Management of the works, the direction of the working force, plant layout and routine of work, including the right to hire, suspend, transfer, discharge or otherwise discipline any employee for cause, such cause being: infraction of company rules, inefficiency, insubordination, contagious disease harmful to others, and any other ground or reason that would tend to reduce or impair the efficiency of plant operation; and to lay off employees because of lack of work, is reserved to the Company, provided it does not conflict with this agreement. . . .

Steelworkers v. American Mfg. Co., *supra*, 363 U.S. at 565, n. 2, 80 S.Ct. at 1345. The normal grievance procedures had been followed prior to suit.

*Warrior* involved a dispute over the right of the company to subcontract part of its work resulting in a partial reduction in the working force. The arbitration clause of the contract provided in part:

> Should differences arise between the Company and the Union or its members employed by the Company as to the meaning and application of the provisions of this Agreement, or should any local trouble of any kind arise, there shall be no suspension of work on account of such differences but an earnest effort shall be made to settle such differences immediately in the following manner: . . .

Steelworkers v. Warrior & Gulf Co., *supra*, 363 U.S. at 576, 80 S.Ct. at 1349. The company relied upon a paragraph in the agreement which stated that "[M]atters which are strictly a function of management shall not be subject to arbitration under this section." *Id.* at 588, 80 S.Ct. at 1356. The normal grievance procedures had been followed prior to suit.

In this case the dispute concerned failure to successfully negotiate increased wages for all employees under a wage reopening clause. The two arbitration clauses contained *no* general language similar to the *Warrior* or *American Mfg. Co.* cases.[2] The language was very specific in referring first to grievances of employees and the presentation of those grievances to management and later to arbitration; and second to the specific question of portions of the contract which might later be invalidated by law. The contract specifically provided that wages on reopening were to be *negotiated* (rather than arbitrated) and the arbitration clause contained a provision prohibiting the arbitrator from adding to, subtracting from or changing the terms of the contract.

---

2. The arbitration clause in *American Mfg. Co.* was described by the Court as the "standard form." *Id.* at 565, 80 S.Ct. 1343. The fact that the parties in the instant action did not adopt the standard form indicates an intent to depart from the customary industry practices concerning the scope of arbitration clauses which the principles enunciated in *American Mfg. Co.* and *Warrior* characteristically control.

The specified grievance procedures were *not* followed and after negotiations broke down the union filed its suit to compel arbitration.

This case can be distinguished from *American Mfg. Co.* and *Warrior* in four significant ways: first, in the wording of the arbitration clause; second, in the subject matter of the controversy; third, in the strength and clarity of the clauses relied upon by management to show arbitration was not intended; and, fourth, in the grievance procedures followed in *Warrior* and *American Mfg. Co.* and ignored here. The distinctions are both obvious and significant. In *American Mfg. Co.* and *Warrior* the wording of the arbitration clause was broad. Here it is narrow and specific. In *American Mfg. Co.* and *Warrior* the grievances related to questions which may or may not have been reserved to management in the contract. Certainly in each case there was a gray area involved. In this case the dispute related to wages on reopening, a subject traditionally reserved to negotiations.[3] In *Warrior* the employer relied on clauses in which the rights of management were referred to but not specifically defined. In *American Mfg. Co.* the clause relied on by the employer did not really cover the question presented by the arbitration. But by the terms of the agreement in this case the arbitrator was expressly forbidden to *change* any term of the contract. In *Warrior* and *American Mfg. Co.* normal grievance procedures were followed prior to suit. In this case no pretext was made by the union of following the grievance procedures specified in the contract.

These distinctions become especially significant in light of some of the holdings of *Warrior*. First, as heretofore stated, the majority opinion made it clear that the court must first determine whether or not the parties have *contracted* to arbitrate a particular dispute:

> The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. *For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.*

Steelworkers v. Warrior & Gulf Co., *supra*, 363 U.S. at 582, 80 S.Ct. at 1353 (emphasis supplied).

This holding, it should be noted, was a predicate for the holding which indicated that doubts should be resolved in favor of coverage. Resolving doubts under a contract is obviously not the same as stating that anything which is not excluded is, by implication, included. In our opinion, there is simply no doubt to be resolved in this case.

Second, the Court in *Warrior* placed special emphasis on the broad arbitration clause in the *Warrior* contract when it said:

> In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, *particularly where, as here,*

---

3. We believe that in general, "[d]isputes as to 'rights' are adjudicable under the laws or agreements on which the rights are based, and are readily adaptable to settlement by arbitration. Disputes as to 'interest,' on the other hand, involve questions of policy which, for lack of predetermined standards, are not generally regarded as justiciable or arbitrable." Elkouri and Elkouri, How Arbitration Works (3d ed. 1973). *See also* Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945) for a general discussion concerning the arbitrability of "major" and "minor" disputes, and the different treatment accorded thereto in the railroad industry.

*the exclusion clause is vague and the arbitration clause quite broad.*

*Id.* at 584–585, 80 S.Ct. at 1354 (emphasis added).

In *American Mfg. Co.*, Justice Brennan, concurring, stated:

The Court rightly concludes that appropriate regard for the national labor policy and the special factors relevant to the labor arbitral process, admonish that judicial inquiry into the merits of this grievance should be limited to the search for an explicit provision which brings the grievance under the cover of the exclusion clause since *"the exclusion clause is vague and arbitration clause quite broad."*

Steelworkers v. American Mfg. Co., *supra*, 363 U.S. at 572, 80 S.Ct. at 1365 (emphasis supplied).

As heretofore indicated, the arbitration clause in this case is very narrow and the exclusion clause is certainly not vague.

Third, in both *Warrior* and *American Mfg. Co.* the Court held that it was not really clear under the contract whether the particular dispute in issue involved a matter specifically reserved to management. It stated in *Warrior*:

Respondent claims that the contracting out of work falls within this category. Contracting out work is the basis of many grievances; and that type of claim is grist in the mills of the arbitrators.

Steelworkers v. Warrior & Gulf Co., *supra*, 363 U.S. at 584, 80 S.Ct. at 1354.

And in *American Mfg. Co.* the Court stated:

The union claimed in this case that the company had violated a specific provision of the contract. The company took the position that it had not violated that clause. There was, therefore, a dispute between the parties as to "the meaning, interpretation and application" of the collective bargaining agreement.

Steelworkers v. American Mfg. Co., *supra*, 363 U.S. at 569, 80 S.Ct. at 1347.

No such interpretation of the contract is possible in this case. The subject of wages is traditionally reserved to negotiation and is not normally subject to arbitration.

Since the Steelworkers' trilogy in 1960,[4] there have been no cases decided in federal courts involving this precise issue that have been called to our attention. However, there have been at least two arbitrator's decisions on cases very similar to this one.

In Hughes Tool Co., 36 Lab.Arb. 1125 (1960) the arbitrator held that the contract could not be construed to require arbitration of wages on reopening in a factual situation similar to this case. In that case the arbitrator placed special emphasis on a clause which provided that an arbitrator could not change or modify any provision of the agreement. In Hughes Tool Co. there was also a much broader arbitration clause than is present in this case.

In Rose-Derry Ohio, Inc., 49 Lab.Arb. 40 (1967) the opposite result was reached but great emphasis was placed

---

4. Prior to the Steelworkers' trilogy several cases involving this question were the subject of arbitrators' decisions. In the following cases the fact that a collective bargaining agreement contained a wage reopener did not oblige the parties to agree on wage increases. Thus disputes arising upon impasses in negotiations under a wage reopener were held to be nonarbitrable. P. P. Williams Co., 24 Lab.Arb. 587 (1955); West Penn Power Co., 24 Lab.Arb. 741 (1955); Air Reduction Sales Co., 10 Lab.Arb. 528 (1948); In re Berger, 9 Lab.Arb. 1048 (1948). Cases taking the opposite view include: Sacramento Wholesale Bakers Ass'n, 20 Lab.Arb. 106 (1952); Lincoln Dairy Co., 14 Lab.Arb. 1055 (1950).

on the fact that the arbitration clause was very broad providing that *"any* and *all* . . . disputes or controversies . . . including *any* matter relating to *wages* . . . not specifically covered herein, shall be . . . resolved in the following manner." Rose-Derry Ohio, Inc., *supra*, 49 Lab.Arb. at 44 (emphasis supplied). This clause alone serves to distinguish that case from this one.

For these reasons we feel it is clear that this case can be logically distinguished from *Warrior* and *American Mfg. Co.* and believe that the trial court's decision represents an unwarranted extension of the holding of those cases.

One further word seems appropriate about the quid pro quo theory. In our opinion this theory was best described by Justice White in his majority opinion in Drake Bakeries v. Bakery Workers, 370 U.S. 254, 261 n. 7, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962) when he stated as follows:

> We do not understand the opinions in Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972, or United Steelworkers v. American Mfg. Co., 363 U. S. 564, 567, 80 S.Ct. 1343, 1346, 4 L. Ed.2d 1403, to enunciate a flat and general rule that these two clauses are properly to be regarded as exact counterweights in every industrial setting, or to justify either party to the contract in wrenching them from their context in the collective agreement on the ground that they are mutually dependent covenants which are severable from the other promises between the parties.

*See also* Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 106, 82 S.Ct. 571, 578, 7 L.Ed.2d 593 (1962) wherein the Court stated as follows:

> What has been said is not to suggest that a no-strike agreement is to

be implied beyond the area which it has been agreed will be exclusively covered by compulsory terminal arbitration. Nor is it to suggest that there may not arise problems in specific cases as to whether compulsory and binding arbitration has been agreed upon, and, if so, as to what disputes have been made arbitrable.

In other words, while the two clauses may be a quid pro quo for each other in a general sense, it does not necessarily mean that the parties cannot limit their application by the terms of the agreement. Often no-strike clauses contain specific exceptions relating to failure to agree upon wages in a wage reopening negotiation. By the same token the contract must be examined to determine what the parties intended to arbitrate and what they did not intend to arbitrate just as Justice Douglas indicated in *Warrior*. Steelworkers v. Warrior & Gulf Co., *supra*, 363 U.S. at 582, 80 S.Ct. 1347.

Judge Heaney notes that "[c]oncern has been expressed that the effect of this opinion will be to make mid-term wage disputes in multi-year contracts subject to arbitration whenever a collective bargaining agreement contains an arbitration and a no-strike clause." He then indicates that the parties can by agreement "exclude such dispute from arbitration." I find no fault with that reasoning but what will the effect be on hundreds of *existing* multi-year labor contracts within this seven-state circuit? Although these opinions by an equally divided Court create no binding precedent for the Eighth Circuit, the argument will certainly be made that arbitration of wage disputes on reopening is a right the *Union* may claim in any case in which the contract includes a no-strike clause and does not specifically prohibit arbitration of wage disputes.

We would reverse with directions to dismiss.