LOCAL 344 LEATHER GOODS, PLASTICS & NOVELTY WORKERS' UNION AFL–CIO, Plaintiff,

v.

The SINGER COMPANY, Piecework Control Systems, Defendant.

No. 79 C 2208.

United States District Court, N. D. Illinois, E. D

Oct. 15, 1979.

\* \* \* \* \* \*

442

William F. Lennon, Chicago, Ill., for plaintiff.

Ronald S. Sheldon, Lederer, Reich, Sheldon & Connelly, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This suit has been brought by Local 344 Leather Goods, Plastics & Novelty Workers' Union AFL–CIO to compel arbitration under a collective bargaining agreement of a dispute between the union and the employer, the Singer Company.[1] In May, 1977, the parties entered into a collective bargaining agreement for a period of three years, to expire on April 27, 1980. In addition to setting forth the agreement of the parties as to wages, hours, and other conditions of employment, the contract included a no-strike provision, a procedure for processing grievances, and an arbitration clause.[2] The

1. Jurisdiction is vested in this Court by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a).

2. *ARTICLE X—STRIKES & LOCKOUTS* provides in relevant part:

 1. NO LOCKOUTS, STRIKES, ETC. It is agreed that it is to the mutual advantage of the employees and the Employer to maintain steady employment at good wages and peaceful and harmonious relations and that no dispute or grievances can or should arise which cannot be settled and adjusted by fair and friendly negotiations or arbitration. Therefore, the Employer covenants and agrees that during the term of this Agreement, or during negotiations for any extension thereof, it shall not lock out its employ-

collective bargaining agreement also granted either party the right to reopen the Article governing wages for the third year of the agreement if the consumer price index in the Chicago area rose 15% from January, 1977 through December, 1978, or more than 9% in calendar year 1978.[3]

Pursuant to this reopener clause, the parties entered into negotiations concerning the appropriate wage increase for the third year of the agreement. On May 12, 1979, after reaching an impasse in the negotiations,[4] the union requested that the dispute be resolved by a neutral arbitrator under the terms of the arbitration clause. On May 22, the employer indicated that it would not go to arbitration, as it believed that the dispute was not covered by the collective bargaining agreement. Shortly thereafter, the union filed this action.

The case is now before the Court on cross motions for summary judgment. The union argues that the terms of the arbitration clause are sufficiently broad to cover this dispute. The employer, on the other hand, puts forth several arguments in opposition to the request for arbitration. First, the employer argues that the arbitration clause only covers grievances over "rights" rather than "interests," with the present dispute falling into the latter category.[5]

---

ees; and the Union and each of its members hereby covenant and agree that during such term or during negotiations for, or any extension thereof, they and neither of them will engage in, foster, encourage, aid or participate in any strike, walkout, stoppage, slowdown, sitdown, picketing or retarding of work of others or with the business of the Employer.

\* \* \* \* \* \*

*ARTICLE XI—GRIEVANCE PROCEDURE* provides in relevant part:

1. Any grievance arising out of the interpretation or application of any term or provisions of this Agreement shall be adjusted and disposed of in the following manner:

FIRST STEP: The grievance shall be written in duplicate form and signed by the party or parties grieved and the Shop Chairman or Steward . . . . Any grievance not so presented within seven (7) days after the time of happening thereof shall be barred.

SECOND STEP: If the grievance is not settled within three (3) days, as provided in the First Step, it shall be taken up by the Shop Bargaining Committee with the Superintendent or Division Manager (or anyone so delegated by him) at a scheduled meeting outside of working hours on the first Friday thereafter at 4:00 p. m. . . . .

THIRD STEP: If the grievance is not disposed of by the foregoing steps then the matter shall be taken up by the chief representative of the Union and the Division Manager of the Employer (or anyone so delegated by him). In the event no agreement is reached in this Third Step, then either party may refer the grievance to arbitration. The party requesting arbitration must notify the other party in writing within thirty (30) days from the date on which the Second Step meeting is held. Failure of the Union to give notice of intention to submit the grievance to arbitration within the time limit set forth

hereinabove shall be deemed an abandonment of the grievance.

\* \* \* \* \* \*

*ARTICLE XII—ARBITRATION* provides in relevant part:

1. Any grievance involving the interpretation, construction or application of the explicit terms of this Agreement which shall not have been satisfactorily settled under the grievance procedure under Article XI of this Agreement may be taken by either the Union or the Employer (but not by an employee) to arbitration in the manner hereinafter provided.

\* \* \* \* \* \*

4. The jurisdiction and authority of the arbitrator of the grievance and his opinion and award shall be confined exclusively to the interpretation of the explicit provision or provisions of the Agreement at issue between the Union and the Employer. He shall have no authority to: (a) add to, adjust, change or modify any provision of this Agreement, or (b) impose a contractual limitation or obligation not explicitly provided in this Agreement.

\* \* \* \* \* \*

3. *ARTICLE XIV—TERMINATION,* ¶ 2.

4. Neither party alleges a lack of good faith in negotiations concerning a midterm wage increase.

5. Rights arbitration concerns the determination of rights and obligations of parties under a present collective bargaining agreement. Interest arbitration, on the other hand, "is concerned with the arbitration of *new* contract provisions, usually resorted to when the parties are unable to agree on the provisions of a new,

Second, Singer asserts that even if the arbitration clause is construed as extending to "interest" arbitration, the reopener provision of the agreement excludes the issues of midterm revision of wages from arbitration. Finally, the employer asserts that if the court finds the dispute to be substantively arbitrable, it nonetheless should refuse to compel arbitration because of the union's alleged failure to comply with the procedural steps necessary to trigger arbitration. Since there are no genuine issues of fact in dispute, the case appropriately may be resolved under Rule 56 of the Federal Rules of Civil Procedure.[6]

## SUBSTANTIVE ARBITRABILITY

Ever since the *Steelworkers Trilogy*,[7] it has been recognized that national labor policy favors the use of arbitration as a means of resolving employer-employee disputes. Underlying this policy is the assumption that arbitration of labor problems provides the best hope for promoting industrial peace and avoiding the economic upheaval that results from strikes and employer lockouts.[8] The Supreme Court has enunciated a number of rules of construction for collective bargaining agreements and arbitration clauses in an effort to facilitate this policy.

In suits to compel arbitration, a federal court has a very limited role. "It is con-

fined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator." *United Steelworkers of America v. American Manufacturing Company*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). The Supreme Court recognized that arbitration agreements are consensual arrangements, and therefore cannot be foisted upon an unwilling party. Yet, the Court held a dispute should not be considered nonarbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of America v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). "In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . ." *Id.* at 584–85, 80 S.Ct. at 1354. The Supreme Court also has given weight to the existence of no-strike clauses in determining whether to submit a matter to arbitration.

renewed, or reopened contract." *N. L. R. B. v. Columbus Printing Pressmen & Assistants Union No. 252*, 543 F.2d 1161, 1163 n. 4 (5th Cir. 1967); *see also* Note, *The Enforceability of Interest Arbitration Agreements Under Section 301(a) of the Labor Management Relations Act,* 27 Syracuse L.Rev. 985, 985–86 (1976). There is little question in this case but that the dispute concerning midterm wage increases is one of interest, rather than rights, arbitrability.

**6.** The Seventh Circuit has noted that "[w]ith the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure whenever appropriate." *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 560 (7th Cir. 1970). With no material issues of fact in dispute, this motion is ripe for summary disposition. Moreover, there are no questions of motive and intent involved in this case. This circuit has observed that such questions are "particularly inappropriate for summary adjudication. *Cedillo v. International Association of Bridge Workers*, 603 F.2d 7, 11 (7th

Cir. 1979). As is evident from the following discussion, this Court's task is not to discover whether the parties intended to submit this question to arbitration, but rather, whether the collective bargaining agreement is susceptible of an interpretation that the dispute is arbitrable. *See* notes 7–10 and accompanying text *infra.*

**7.** *United Steelworkers of America v. American Manufacturing Company*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**8.** *United Steelworkers of America v. Warrior & Gulf Navigation Company*, 363 U.S. at 578, 80 S.Ct. 1347; Syracuse Note, *supra* note 5, at 1005.

It would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. . . . Absent an explicit expression of such intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application. *Gateway Coal Company v. United Mine Workers of America*, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974).[9]

By requiring the court to compel arbitration unless it can say with "positive assurance" that such was not intended by the parties to the agreement, the Supreme Court has sought to ensure that federal courts will not take it upon themselves to deny arbitration because of their own view as to the merits of the dispute.[10] The general linkage of arbitration clauses and no-strike provisions as *quid pro quos* for each other, moreover, has elevated arbitration over the strike as a means of dispute resolution. Thus, the Supreme Court decisions have created an atmosphere in which the arbitration "of . . . differences under a collective bargaining agreement is given full play." *United Steelworkers of America v. American Manufacturing Company*, 363 U.S. at 566, 80 S.Ct. at 1346.

All of these cases concerned the arbitration of disputes concerning "rights" accorded by the contract; none has involved "interest" arbitration. On this basis, Singer argues that the strong presumption in favor of compelling arbitration should not exist in this case. This argument depends on the premise that the differences between interest and rights arbitration are such that the underlying goals of the *Steelworkers Trilogy* would not be served by according interest arbitration a strong presumption.[11]

■ Yet, labor strife can arise just as readily over interests as over rights; indeed, this case highlights that reality. In the absence of arbitration, the likelihood is that interest disputes will lead to strikes or other forms of economic warfare. Some commentators have questioned whether enforcement of interest arbitration clauses can be effective in preventing strikes.[12] Admittedly, interest arbitration is no more an iron-clad guarantee against strikes than is rights arbitration. Nonetheless, both types of arbitration provide the best chance of avoiding the strike and the lock-out. So long as the courts continue to accord a strong presumption to rights arbitration, there is no good policy reason why this presumption should not extend to interest arbitration as well.[13] Thus, this Court finds that interest disputes are entitled to the same presumption of arbitrability accorded

9. *See also United Steelworkers of America v. American Manufacturing Company*, 363 U.S. at 567, 80 S.Ct. at 1346 ("There is no exception in the 'no strike' clause and none therefore should be read into the grievance clause, since one is the *quid pro quo* for the other.")

10. This is precisely what had happened in *American Manufacturing Company*. There, the district court had denied a petition to compel arbitration on the ground that the grievance was "a frivolous, patently baseless one." 264 F.2d 624, 628 (6th Cir. 1959). It was this kind of implicit determination of the merits of labor disputes that the Court believed should be avoided whenever arbitration was a viable alternative.

11. Although some courts have construed Section 301 as limiting the jurisdiction of the federal courts to compelling arbitration in rights disputes, *see, e. g., Mailers Local 136 v. Newspapers, Inc.*, 329 F.2d 312 (5th Cir.), *cert. de-*

*nied*, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 753 (1964), the Seventh Circuit, as well as the majority of federal courts, has found no bar to compelling arbitration of interest disputes. *See Milwaukee Newspaper & Graphic Communications Union Local No. 23 v. Newspapers, Inc.*, 586 F.2d 19, 21 (7th Cir. 1978) (affirming order of district court requiring arbitration of dispute over terms of new contract).

12. Syracuse Note, *supra* note 5, at 1007.

13. Moreover, the Seventh Circuit in *Newspapers, Inc.* held that an interest arbitration clause included in one collective bargaining agreement could not be used to compel an employer to include interest arbitration in all subsequent contracts. 586 F.2d at 21–22. This eliminates the objection that a policy favoring interest arbitration would permanently skew employer-union bargaining relationships.

to rights disputes under the *Steelworkers Trilogy*.[14]

■ It is in light of this presumption in favor of arbitration that the present collective bargaining agreement must be viewed. Article XII of the contract, the arbitration clause, states that "[a]ny grievance involving the interpretation, construction or application of the explicit terms of this Agreement which shall not have been satisfactorily settled" may be taken to arbitration. Article X, which forbids strikes and lockouts, states that "no dispute or grievances can or should arise which cannot be settled and adjusted by fair and friendly negotiations or arbitration." These expansive provisions on their face reflect a general scheme in which negotiation and arbitration are emphasized, while strikes and other forms of economic warfare are to be avoided.[15] Singer's arguments that this broad arbitration clause does not encompass the dispute in question are unpersuasive.[16]

It first argues that the mere existence of a reopener clause does not indicate that the matter of a midterm wage and increase was subject to arbitration. In support of this position, Singer, noting the infrequent use of interest arbitration, cites to several arbitration decisions in which arbitrators have refused to construe an arbitration clause as requiring interest arbitration in the absence of a specific mention thereof. The arbitral decisions, however, are not unanimous in this viewpoint.[17] Moreover, to the extent that interest arbitration is used, it is most prevalent with respect to wage questions.[18] Thus, in view of the general language of the contract favoring arbitration, it cannot be said with "positive certainty" that the parties would have agreed to interest arbitration only if specifically provided for in the collective bargaining agreement.

■ Singer also asserts that Article XIV, Paragraph 4, impliedly excludes this dispute from arbitration. That clause provides that if proposed amendments are not mutually

---

**14.** Few courts have given serious attention to whether the Steelworkers Trilogy should apply to interest arbitration. Several circuits, however, have suggested that the presumption of arbitrability pertains equally to interest and rights disputes. *See Laundry, Dry Cleaning and Dye House Workers International Union, Local 93 v. Mahoney*, 491 F.2d 1029 (8th Cir. 1973) (equally divided court), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974); *Pressman's Local 318 v. Piedmont Publishing Co.*, 393 F.2d 221 (4th Cir. 1968); *A. Seltzer & Co. v. Livingston*, 361 F.2d 218 (2d Cir. 1966), *affirming* 253 F.Supp. 509 (S.D.N.Y.).

**15.** Singer suggests that the no-strike provisions of Article X might be interpreted as inapplicable to disputes over midterm wage negotiations, and apparently invites the Court to so hold in lieu of compelling arbitration. To favor the strike over arbitration, however, flies in the face of all that underlies the *Steelworkers Trilogy*. Accordingly, the Court declines to pursue this course.

**16.** The fact that, absent the presumption of arbitration, the collective bargaining agreement might be susceptible to a different reading is no bar to deciding this case on the cross motions for summary judgment. *In Associated Milk Dealers, Inc. v. Milk Drivers Union, Local 753*, 422 F.2d 546 (7th Cir. 1970), the court reversed a summary judgment order compelling arbitration of a rights dispute. In that case, the defendant employer opposed the motion for sum-

mary judgment and sought to introduce parol evidence concerning the extent of its contractual duty. In this context, the court held that it was error on the part of the trial court to decide the case on summary judgment when a critical issue of fact still was contested. Here, both parties are moving for summary judgment, and neither party suggests that there is material which the court has failed to consider which would aid in determining the facial arbitrability of the dispute.

**17.** Compare *In Re Hughes Tool Co.*, 36 Lab. Arb. 1125, 1128 (1960) ("[I]t seems most unlikely . . . that the parties would have contemplated the arbitration of a wage reopening dispute and yet not have provided specifically in the Agreement for such an eventuality.") and *In re Sacramento Wholesale Bakers Assoc.*, 20 Lab.Arb. 106, 108 (1952) ("Could a dispute over an interim opening not be arbitrated, the right of the union to open would be largely meaningless, since strikes are prohibited during the life of the contract.")

**18.** Fleming, *Reflections on the Nature of Labor Arbitration*, 61 Mich.L.Rev. 1245, 1254 (1963). In a more recent article, this same commentator has suggested that interest arbitration might be emerging as a more significant factor in labor management relations. Fleming, *"Interest" Arbitration Revisited*, 7 U. of Mich. J.Law & Law Ref. 1 (1973).

agreed upon by the termination date of the Agreement, either party may terminate the agreement upon five days written notice. This provision, however, does not explicitly preclude arbitration on the issue of wage reopening. Indeed, Article IX, Paragraph 3, specifically precludes arbitration of disputes concerning the interpretation and application of Group Insurance and Retirement Benefit plans. This suggests that, if anything, the parties expressly excluded arbitration when such was their intent.[19]

■ There is nothing else in the agreement that provides compelling evidence of an intent to exclude this dispute from arbitration. *Warrior and Gulf Navigation Company*, 363 U.S. at 584–85, 80 S.Ct. 1374. The provision forbidding the arbitrator to "(a) add to, adjust, change or modify any provision of this Agreement, or (b) impose a contractual limitation or obligation not explicitly provided in this Agreement," would not be violated by an order to arbitrate. Indeed, the threshold task for an arbitrator in this case will be to interpret the reopening provision to determine whether it contemplates the arbitration of disputes concerning midterm wage increases. If an arbitrator concludes that the contract does call for arbitration of this dispute, then an ensuing arbitral award would no more exceed the arbitrator's authority than does any remedy which is granted in a rights arbitration case.[20] Perhaps the most plausible interpretation of this agreement is that it was

> written in ambiguous terms because the parties chose that path in the hope that a day of reckoning would never come. It is

no surprise to any of us that in permanent umpire situations, the parties have often preferred vague contract language, whose interpretations will be left to a trusted umpire, rather than bog-down in negotiations over something on which they cannot exactly agree.[21]

Whatever the subjective intent of the parties when they signed the collective bargaining accord, however, it is clear to this Court that the agreement on its face requires that arbitration of this dispute be compelled.

## PROCEDURAL ARBITRABILITY

■ Singer also asserts that even if this Court finds the dispute substantively arbitrable, it must deny the petition to compel arbitration for failure to comply with the Grievance Procedure as outlined in Article XI. In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964), however, the Supreme Court held that:

> [o]nce it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.

The reason for this rule is similar to that for the rule of presumptive arbitrability. The Court in *Wiley* expressed the concern that matters of procedure often overlap with those of substance; therefore, a denial of a petition to arbitrate on procedural grounds in fact might operate *sub silentio* as a decision on the merits of the dispute.

---

**19.** Singer points to Article IV, Paragraph 6, as evidence that when the parties intended a point to be arbitrable they stated so expressly. That article provides that disputes over job classifications may be taken up at Step 3 of the Grievance Procedure. Properly construed, however, all this provision does is entitle the union to bypass the first two steps of the grievance procedure. To adopt Singer's interpretation would render the general arbitration clause of Article XII essentially meaningless, since there are no other Articles in the contract for which arbitration is specifically provided.

**20.** Nor can it be said that the use of the term "grievance" in an arbitration clause limits the jurisdiction of the arbitrator to disputes concerning rights. There is nothing to indicate that the term "grievance" was chosen with that limiting purpose in mind. Indeed, the word just as readily may be considered as synonomous for "dispute" or "complaint," in which case it would include interest arbitration.

**21.** Fleming, *"Interest" Arbitration Revisited*, 7 U. of Mich.J. of Law & Law Ref. 1, 2–3 (1973).

The defendant seeks to escape the result mandated by this rule by arguing that *Wiley* suggested a different rule would obtain where the defect is "purely" procedural and bars the arbitration itself rather than limits or qualifies the arbitral award. The Court has never stated definitively whether a different standard applies in such cases.[22] Even if a different rule applied, however, Singer could not benefit from such a rule in the instant case. Here, the reopener provision sets forth a separate procedure for initiating midterm wage negotiations.[23] Thus, the question would be whether, in light of these procedures internal to Article XIV, recourse to the grievance procedure in Article XI is necessary. The answer to this question depends at least in part on the substantive interpretation given to the reopener provision. The court cannot say with assurance that a decision on this "procedural" question would not implicate the substantive merits of this dispute. Whether the procedural prerequisites of arbitrability as set forth in Article XI have been met is a matter for the arbitrator to determine.

For the foregoing reasons, the petition to compel arbitration is granted. It is so ordered.[24]

---

**22.** In *International Union of Operating Engineers, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), the Court declined to determine whether *Wiley* provided for such a dual standard.

**23.** Collective Bargaining Agreement, Article XIV, Paragraphs 2–4.

**24.** It should be emphasized that all this Court decides today is under the *Steelworkers Trilogy*, there is an inadequate basis to deny the petition to compel arbitration. The opinion does not purport to compel the arbitrator to find that the matter is arbitrable, or to reach a resolution favorable to the union. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 554, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *see also In Re Borman Investment Co.*, 65 Lab.Arb. 142, 147 (1975) (arbitrator rejected as nonarbitrable a dispute which the federal court had ordered to arbitration under the *Steelworkers Trilogy*.)